UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

KENTUCKY HEARTWOOD, INC.,               )
                                        )
         Plaintiff,                     )
                                        )        No. 6:22-CV-169-REW-HAI
v.                                      )
                                        )        OPINION & ORDER
UNITED STATES FOREST SERVICE, *et*      )
*al*.,                                  )
                                        )
         Defendants.                    )
                        \*\*\*  \*\*\*  \*\*\*  \*\*\*

The United States Forest Service (Service), perceiving its statutory obligation to "improve and protect the forest" for the use and necessities of the citizens of the United States, 16 U.S.C. § 475, proposed the South Red Bird Wildlife Habitat Enhancement Project (SRB Project). The Project, as styled, aims to cultivate a more diverse forest habitat through thinning, harvesting, herbicide, and other measures in the public portion of a 55,000-acre area of the Daniel Boone National Forest. Kentucky Heartwood (Heartwood), at odds with the Service's view that timber harvesting was necessary to achieve those aims, and raising other environmental concerns, actively opposed much of the Project during the notice and comment process. After strenuously objecting, it ultimately filed this suit challenging the Project under the Administrative Procedure Act. Under the APA, the Court is tasked only with deciding whether the Service acted arbitrarily or capriciously, abused its discretion, or otherwise failed to act in accordance with the law. *See* 5 U.S.C. § 706(2). Because the Service complied with these obligations in crafting the SRB Project, the Court finds in its favor as to the Final EA and FONSI issuance. However, the Court remands to the Service for further clarification as to its consideration of Heartwood's post-decision supplemental materials.

## I.    Background

In 2004, the Service developed, pursuant to its statutory obligations under the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 1604(e)(1), its most recent Forest Plan for the Daniel Boone National Forest (DBNF or Forest). The plan commits the Forest, which spans over 700,000 acres of federal land in Eastern Kentucky, to "multiple uses," including "outdoor recreation, minerals, timber, watersheds, fish and wildlife, and wilderness[.]" R. at 4133. The Plan implements its many standards through a "series of project-level decisions based on appropriate site-specific analysis and disclosure." *See id.* In other words, the Plan provides a "framework for decision-making," leaving flexibility for specific projects or site-specific actions. *See id.*

Armed with the new Plan, the Service first notified the public in 2007 of its intent to explore possible management activities in the South Red Bird Project Area (SRB Area), a 55,000-acre portion of the DBNF situated in the southern portion of the Forest. *See* R. at 1059. The letter called for public input at two meetings in 2007, where members of the public generally expressed interest in more active management of the SRB Area as it pertained to road maintenance, trash clean up, insect infestations, and other concerns. *See* R. at 1093. Then, the Service engaged in a nearly decade-long scoping process, analyzing, relative to the Plan and the potential project, the overall condition of the forest in the SRB Area, including factors such as age, tree species distribution, health, and similar factors. *See generally* R. at 97–924.

After nearly ten years of scoping, the Service again called for public comment in 2017, requesting views concerning the current conditions of the Forest, along with recommendations for potential improvements. *See* R. at 1094. The public, along with Service employees, expressed similar concerns from a decade ago, specifically citing road maintenance, trash cleanup, lack of young forest and wildlife foraging cover, and insect infestation. *See* R. at 1100–06. The public

2

comment process also involved field visits to the SRB Area, featuring speakers from the community, Service, and interested organizations addressing forest conditions, management approaches, forest development, and cultivation. *See* R. at 1220–36. Jim Scheff, Heartwood's ecologist, spoke on the importance of protecting old forest growth—as he had at the earlier workshop—while others raised the importance of seral, or young, habitats to forest longevity or biodiversity. *See id.* That posture extended into a fourth public meeting in 2017, with various members of the public seeking trail, road, and habitat enhancements, Scheff and Heartwood seeking forest preservation, and other groups promoting the need for early seral habitat. *See* R. at 1279–80.

Backed with public and interest group input, surveys, and scoping, in March 2018, Robert Claybrook—District Ranger for the Redbird District—issued an official scoping letter for the SRB Project. *See* R. at 968–73. The letter raised various issues in the SRB Area, gleaned from public and Service input, including lack of diverse habitats, absence of early seral habitat (ESH), road and trail maintenance issues, and invasive species issues. *See id.* In light of those challenges, the letter proposed various remedial efforts including acreage goals for forage-producing trees, midstory tree removal, salvage timber sales, and prescribed burning, among others. *See* R. at 969–71. The letter also provided for a 30-day comment period. *See* R. at 972–73.

Comments to the scoping letter varied just the same as in the scoping workshops. Some voiced general approval for the Project, while others opposed aspects of the Project—primarily logging. *See* R. at 1015–28. Scheff, personally and on Heartwood's behalf, tendered a nine-page comment to the scoping letter. The letter disputed the Service's forest-age calculations, requested that the Service consult the Fish and Wildlife Service concerning endangered and threatened

species believed to be in the SRB area, and suggested alternatives to logging, one of them a proposal to simply let things be. *See* R. at 1035–43.

Following scoping, the Service continued to formal analysis and study of the SRB Project under the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Endangered Species Act (ESA). The Service prepared detailed reports assessing the potential effects—positive and negative—of the SRB Project from various angles ranging across vegetation, *see* R. at 2180–2212, soil and water, *see* R. at 1996–2020, and wildlife, *see* R. at 2282–2324. *See also* R. at 2213–66 (uncommon botanical resources and non-native plant species), 1802–22 (socioeconomics), 1798–99 (recreation).

After assessing report findings, the Service published its draft Environmental Assessment (EA) in November 2019, pursuant to its NEPA obligations. *See* R. at 1433–1504. The Draft EA conceived of the SRB Project as an effort to "improve wildlife habitat with a wider variety of age class distribution, plant composition, and structural diversity than currently exists" in the SRB area. R. at 1434. Notably, the Draft EA tailored several of the acreage goals and proposed actions from the scoping letter based on report findings and public comments. For example, the Service reduced some acreage of proposed harvesting to commercial thinning, it removed certain tree stands from the seral/young forest habitat acreage goal, created "group selection openings" in select midstory removal areas to increase composition and structure of the stands, and proposed new forest system roads to connect three sections of mining roads in the SRB Area. *See* R. at 1441–46. The Service left open another 30-day window for comments and responses. *See* R. at 1506.

Again, Scheff, on behalf of Heartwood, responded, now with a 26-page written response and several hundred pages of attachments. *See* R. at 2516–41, 2542–3298. The response raised or repeated various concerns, many of which Scheff raised earlier in the scoping process and through

other comments. Mainly, he argued that the Service failed to consider the effects and impacts of erosion and sedimentation caused by logging, that the SRB Project would jeopardize several endangered species, that the Service wrongly calculated stand age as a basis for the Project, and that the SRB Project would increase invasive plant species. *See* R. at 2516–41. The Service summarized Heartwood's comments, along with all other public comments fielded during the 30-day notice period. *See* R. at 3306–08. Again, the Service was faced with conflicting sentiments. Some comments voiced support for young forest creation, wildlife enhancement, old growth management, and other aspects of the Project. *See* R. at 3307. These lay alongside comments voicing strong displeasure with any logging in the area, a lack of collaboration, and even "opposition to the entire project with no substantive rationale." *See* R. at 3307–08.

From there, the Service addressed comments, implemented changes and additions to the Project, and ultimately filed its Final (EA) with a Finding of No Significant Impact (FONSI) in February 2020, pursuant to NEPA. *See* R. at 1510–87, 3859–71. The Service also released a comment response document, offering individualized responses to all comments received during the 30-day comment period. *See* R. at 3310–39. Notably, the Service again made pertinent changes and additions to the Project based on comments received to the Draft EA. As just a few examples, the Service added analysis concerning sedimentation and landslide effects on the SRB Area and listed species, *see* R. at 2311–12, it added an addendum to the previously prepared soil and water report further addressing erosion concerns, as backed by field testing from Service scientists, *see* R. at 2059–94, and it removed certain stands from proposed harvesting areas based on sedimentation risks. *See* R at 3312–13.

After a brief pause for the COVID-19 pandemic, the Service re-opened the 45-day objection period in August 2020. *See* R. at 3882. The only two objectors—Heartwood and the

Ruffed Grouse Society (RGS)—suggested two very different approaches for the Service. RGS, noting a forest-wide decline in early seral growth, proposed that the Service "increase the acreage of regeneration treatments in the project area to achieve early seral habitat" to between 20–25% of the SRB Area, up from the 3.9% currently proposed. *See* R. at 3342. The move, in RGS's eyes, would "increase the forest's structural and age-class diversity and provide critical habitat for ruffed grouse, woodcock, and other forest wildlife." *See id.* Heartwood tacked sharply, relative to RGS. Again through Scheff, Heartwood submitted a lengthy objection to the Service's Final EA, largely rehashing the same arguments it made during the scoping phase and in comments to the Draft EA. *See* R. at 3346–75. In sum, Heartwood suggested that the Service "go back to the drawing board with this project and develop a new proposed action." R. at 3375.

Again, the Service engaged with Heartwood. It filed an updated Biological Assessment (BA) addressing many of the group's concerns, *see* R. at 2442–65; it issued yet another report addressing Heartwood's sedimentation objections, *see* R. at 4996—99; and it prepared individualized responses to each of Heartwood's specific points, *see* R. at 2102–31. The process culminated in an in-person objection resolution meeting, held between Claybrook, Heartwood, and RGS. *See* R. at 3837–46. The meeting produced, to the Service at least, "commonalities" on several issues, but a resolution on erosion and landslide concerns was not reached. *See* R. at 3850–51.

With all objections addressed, the Service finalized the Project. On January 19, 2021, it issued its Final Decision Notice and Finding of No Significant Impact, as modified to resolve objections where possible. *See* R. at 3889–3900. That day, the Service also filed its Final Objection Resolution Letter, responding to Heartwood's individualized objections with updates from supplements and discussions. *See* R. at 3847–52.

6

Things were quiet for a while. But then, in February 2022, Scheff tendered (seemingly out of the blue) over 1,600 pages of information to the Service concerning the SRB Project. Many of the themes remained the same in Scheff's 45-page accompanying letter, *see* R. at 5000–45. The bulk of Scheff's materials, at least as relevant to this case, concern two main issues. First, Scheff claimed that, through an acoustic bat survey conducted by someone at Heartwood, Heartwood discovered positive findings for three types of listed bat species in the SRB Area: the Indiana bat, the Northern Long-eared bat, and the Gray bat. *See* R. at 5039. Scheff then faults the Service for increasing or altering harvest prescriptions around potential bat colonies between the draft and final EAs, insinuating that "perhaps the Service knows of a maternity tree or colony in the project area." R. at 5040. Next, Scheff presented evidence of landslides in the Northern Red Bird/Group One project area.[1] Heartwood generally surmised, in much more detail than could possibly be said here, that similar landslides are likely to occur in time in the SRB Area. *See* R. at 5040–43. The Service confirmed receipt of the supplemental letter and information, *see* R. at 6677, but took no further documented action beyond a telephone listening session with Heartwood. Heartwood later submitted another twelve-page supplemental letter to the Service, *see* R. at 6710–23 (addressing fire-damage justifications). The Service, at least on the Record, did not confirm receipt of the letter or otherwise take corrective action based on its contents.  That November 2022 tender was post-litigation.

In April 2022, Heartwood had provided the Service notice of intent to sue. *See* R. at 6682. It then filed a complaint in September 2022, bringing APA §§ 704 and 706 review claims for purported violations of NEPA, NFMA, and ESA. *See* DE 22 (Amended Complaint) at 71–75. The

---

[1] The NRB/Group One project area is an entirely distinct project area within a different part of the DBNF. *See* R. at 1514. The Service implemented its plan to the NRB area several years before the SRB Project. As such, much of the timber harvesting in that area was complete by the time the SRB Project advanced through the process.

Service filed a final Administrative Record (Record), as required for review of agency action by the APA. *See* DE 36. Based on the parties' agreement, the Court permitted supplementation to the Record of nearly 600 pages of additional material. *See* DE 41. Thereafter, and following a long detour precipitated by disputes over Record completeness, the parties filed cross-motions for summary judgment, *see* DE 60; 63, and Heartwood moved for a preliminary injunction on the SRB Project, *see* DE 64. The parties each responded and replied to the other's motion(s), and all three motions are now ripe for review.

## II.    Analysis

Lacking private rights of action under NEPA, NFMA, and ESA, Heartwood brings each of its claims under the APA. Judicial review of an action under the APA is limited to determining whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Marsh v. Oregon Natural Resources Council*, 109 S. Ct. 1851, 1861 (1989). The "focal point" for review is the administrative record already in existence, rather than a new record made before the reviewing court. *Florida Power & Light Co. v. Lorion*, 105 S. Ct. 1598, 1607 (1985). The party challenging agency action bears the burden of showing the action to have been arbitrary or capricious. *See Kroger Co. v. Regional Airport Auth.*, 286 F.3d 382, 389 (6th Cir. 2002).

The arbitrary and capricious analysis takes special form when the agency's action turns on "a factual dispute which implicates substantial agency expertise." *See Marsh*, 109 S. Ct. at 1860. In that setting, the Supreme Court has explained, and the Sixth Circuit has confirmed, that where an agency decision "requires a high level of technical expertise," agencies "must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *See id.* at 1861; *Sierra Club v. Slater*, 120 F.3d 623,

8

633 (6th Cir. 1997); *see also Kentucky Res. Council, Inc. v. E.P.A.*, 467 F.3d 986, 991 (6th Cir. 2006) (noting that "where the challenge concerns the agency's scientific determinations, the court will 'defer in large part' to the agency's expertise" and explaining that "a reviewing court should be at its most deferential in reviewing an agency's scientific determinations in an area within the agency's expertise") (quoting *BP Exploration & Oil, Inc. v. EPA*, 66 F.3d 784, 792 (6th Cir.1995)).

The parties have filed cross motions for summary judgment. In the normal civil case, these motions would implicate the Rule 56 standard, requiring the moving party to show no genuine dispute of material fact entitling it to judgment as a matter of law. FED. R. CIV. P. 56(a). That standard, however, takes a special shape in the APA context. Although Rule 56 is still an appropriate mechanism for getting to judgment, the traditional standard bends to the fact that, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," not a forum of first impression. *See Chamber of Com. of United States v. Sec. & Exch. Comm'n*, 670 F. Supp. 3d 537, 550–51 (M.D. Tenn. 2023) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). Thus, the "parties' task is ordinarily not to produce a new factual record," because "[t]he entire case on review is a question of law, and only a question of law," based on the administrative record before the court. *See Chamber of Com.*, 670 F. Supp. 3d at 551 (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). The Court narrows its scope and approach accordingly.

### a. NEPA

NEPA tasks federal agencies with preventing damage to the environment and advancing human health and welfare. *See* 42 U.S.C. § 4321; *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 462 (6th Cir. 2014). NEPA itself does not "mandate particular results" to accomplish these ends, *Dep't of Transp. v. Pub. Citizen*, 124 S. Ct. 2204,

2209 (2004), but imposes procedural requirements to focus agencies on, and require consideration of, the environmental impact of their proposals and actions. *See id.*

NEPA may require an acting agency to prepare one of two documents: an Environmental Assessment (EA) or an Environmental Impact Statement (EIS). *See* 40 C.F.R. § 1500.3; §§ 1501.4(a)–(b). An EA is a "concise public document" prepared by a federal agency, which, if properly compiled, "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an Environmental Impact Statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). An EA facilitates NEPA compliance when an EIS is unnecessary. *Id.*; *see also Kelley v. Selin*, 42 F.3d 1501, 151 (6th Cir. 1995). The agency will first prepare an EA "in order to determine whether the project's effect on the environment will be significant enough to warrant" the more detailed EIS. *Sierra Club*, 120 F.3d at 635. Preparing an initial EA "allows the agency to consider environmental concerns, while reserving agency resources to prepare full EIS's for appropriate cases." *Id.* If a FONSI follows the EA, then the agency need not prepare the more formal and exhaustive EIS. *See id.* (citing *Park Cnty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 621 (10th Cir. 1987)). That determination—whether an EIS is necessary—is the responsibility of the agency in question, *see Sierra Club*, 120 F.3d at 635, a decision overturned by a reviewing court only if arbitrary or capricious. *See id.*; *see also Kelley*, 42 F.3d at 1518.

In assessing whether an agency's decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 109 S. Ct. at 1861. That calls for a "searching and careful" inquiry, but "the ultimate standard of review is a narrow one." *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 91 S. Ct. 814, 823 (1971)). Considering that narrow standard of review, the Court may not "substitute" the agency's decision with its own

preferred approach. *See Kelley*, 42 F.3d at 1518 ("We will not substitute our judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue."); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (noting that "federal judges . . . enforce [NEPA] by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results"). The Court's task is limited to assessing "whether the agency has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." *Kelley*, 42 F.3d at 1518–19.

Heartwood makes three basic arguments to allege deficiency in the Service's NEPA compliance: it argues the Service violated NEPA by failing to take a "hard look" at the environmental consequences of the Project as it relates to landslides, *see* DE 63-1 at 7; it views the Service's calculation of forest-stand ages as arbitrary and capricious, *see id.* at 19; and finally, it views the Service's approach to oak recruitment as arbitrary and capricious, *see* DE 68 at 16–18.

The Service denies each of these allegations, *see* DE 60 at 18, 23, 25.

### i. Sedimentation and Erosion

Heartwood contends that "[t]he Service failed to take a 'hard look' at the environmental consequences of the Project because it failed to consider the impacts of landslides." DE 63-1 at 7. It complains "[t]he Service stopped after merely considering the possibility of landslides, mass wasting events, sedimentation, and erosion, and never took the step to consider the impacts of any landslides on the environment . . . ." *Id.*

The Record, reasonably read, tells a different story. Since the Project's inception, assessing, managing, and mitigating against the possibility of landslides has been a throughline in the Service's decision making. The thread goes back at least to August 30, 2019, when a hydrologist and a soil scientist for the Service submitted a detailed report assessing the soil and water in the

11

SRB Area. *See* R. at 1996–2020. The Report specially delt with erosion, both from a risk perspective and a management perspective. It concluded, with particular emphasis on roads and trails, erosion risks ranged from moderate to severe and that "frequent maintenance and erosion-control measures are needed." *See* R. at 2008. The report then went on to assess the effectiveness of certain erosion mitigation tactics across the SRB Area. *See* R. at 2009. It concluded that a range of Best Management Practices (BMPs) were effective in limiting erosion risks, including prescribed fires, motorized or non-motorized trail operation and maintenance, ground-based skidding and harvesting, and mechanical site treatments. *See* R. at 2009–10.

The Service was candid about the potential risks of erosion and sedimentation in the SRB Area. The Draft and Final EAs both dealt heavily with the issue of sedimentation, citing the Service's previous work on the issue during the scoping process. *See* R. at 1460–63, 1537–44. The Draft EA noted that "the primary soil concern for this project is erosion, driven by the fine-loamy textures, rock content, and slopes of the area[,]" as assessed in the 2019 soil report. *See* R. at 1460–61. "[H]eavy equipment use, including skidding, decking, and transportation of logs" increased erosion risks throughout the SRB Area. *See* R. at 1461. The Final EA reiterated those concerns and added an expansive section addressing comments concerned about sedimentation, many from Heartwood. *See* R. at 1538–1540. The Service, in response to these comments, implemented various risk reduction efforts to hedge against the possibility of landslides due to erosion. For example, the Service designated certain "soil protection zones" to be marked prior to logging that will "exclude heavy equipment due to slope, erodible soils, and/or the presence of the Fireclay and/or Fireclay Rider coal seams," and it added design criteria to reduce the potential for erosion or landslides by requiring operators to mulch high risk areas after a harvest and to seed as soon as conditions allow for germination to reduce exposed soil. *See* R. at 1539. The Service also added a

"Soil Protection Map" for the SRB Area, including slopes of each unit and their corresponding risk of erosion. *See* R. at 1540.

The Service never "downplayed" or "dismissed" the possibility of landslides either. *See* DE 63-1 at 13. The Record readily demonstrates the Service's willingness to engage with concerns in an objective, measured manner. For example, during the Draft EA objection period, Heartwood submitted an objection letter complaining that the Service's treatment of erosion risks was inadequate because the Service's BMPs were not tested in the Project area and earlier BMPs in a geologically similar area allegedly failed to protect against landslides.[2] *See* R. at 2523–27. In response, Service soil scientists and hydrologists crafted a 36-page report on sedimentation issues. *See* R. at 2059–95. It thoroughly addressed the origin of the referenced landslides, even prompting an on-the-ground visit by the response writers, concluding as a general matter that a combination of steep slopes, coal seams, and rooted clays were to blame. *See* R. at 2064. It went on to note relevant geological differences between the two project areas, including that the SRB Area had a lower median slope[3] and a lower maximum harvest unit slope. *See* R. at 2067. Importantly, the report also added protective measures to the EA based on these findings to further hedge against landslide risks, like avoiding trails or roads over coal seams of high gradients, increased mulching and seeding, and installation of more waterbars[4] on skid trails. *See id.* In a separate response document, the Service also provided an individual response to all erosion-based comments, each of which provided substantive analysis and support for the Service's approach. *See* R. at 3312–18. The Court eschews further specific examples to instead emphasize the underlying theme: when

---

[2] None of the landslides Heartwood complains of occurred in the SRB Area.

[3] To be sure, the Service later altered its slope calculations, potentially weakening this specific rationale. Nonetheless, as discussed, the Service's bolstered BMPs, design criteria, and strong analysis overcome arbitrary and capricious review regardless of slope calculation concerns.

[4] Effectively, a drainage channel dug across roads and paths to direct water.

13

Heartwood spoke, the Service listened and tailored the Project, as it deemed warranted, to address supportable concerns.

Heartwood faults the Service for supposedly considering the possibility of landslides, but not their resulting impact. *See* DE 63 at 7–10. Confusingly, in the same section, Heartwood also claims that "[w]ith exception to the final EA, the Record only concludes that BMPs and Forest standards will reduce the impacts of these landslides." *See id.* at 8. In the Court's reading, the Record shows that the Service was acutely aware of the impacts of possible landslides and factored that awareness into its analysis. For one, the ample time spent on mitigation strategies demonstrates that the Service appreciated the negative impacts of landslides. After all, why would the Service go to the trouble of sending scientists to study the Project Area and prepare an erosion report if it thought landslide risk to be a non-factor. In some sense, impact is baked into the pursuit of mitigation. *See Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1139 (9th Cir. 2006) ("Through study, restudy, submission to review by independent experts, and modification of plans, the Corps has taken a hard look at the cumulative impact of the channel deepening project, including disposal of dredged material, on sediment availability and coastal erosion.").

Even still, the Draft and Final EAs clearly show that the Service was aware of the risks of landslides and actively sought to reasonably and effectively prevent them.[5] Heartwood does not

---

[5] *See* R. at 1460 (Draft EA) ("The biological, chemical, and physical characteristics of forest soils influence the quality and quantity of water that is delivered to forest streams and downstream areas. Forest soils support a high abundance and diversity of micro-and macro-faunas, help reduce flooding, and filter contaminates[.]"); 1465 (Draft EA) ("To mitigate soil erosion and stream sedimentation, Action 8 was developed carefully to eliminate the need for dozer-created fire control lines, using instead natural topography and waterways and hand-cleared fire lines. Therefore, there should be little to no impacts to soils or streams following prescribed burns in the Proposed Action because fire crews would follow standards set in the Forest Plan[.]"); 1541 (Final EA) ("Other impacts to soils from project activities include compaction and changes to the O horizon resulting from exposed mineral soil. Please refer to the South

meaningfully deal with these passages, arguing only that the Service was content with risk reduction rather than elimination. *See* DE 63-1 at 8. Nothing requires the Service to eliminate, categorically, such risks. *See Dep't of Transp.*, 124 S. Ct. at 2209 ("NEPA itself does not mandate particular results"); *Robertson v. Methow Valley Citizens Council*, 109 S. Ct. 1835, 1846 (1989) (NEPA requires agencies to discuss steps taken to "mitigate adverse environmental consequences"). Indeed, that would prove an impossible task, so it suffices that the Service perceived risks and meaningfully addressed them. There's little rational doubt that the Service did that here.

Heartwood also argues that the Service acted arbitrarily and capriciously in "excluding larger landslides from its analysis," referencing landslides in the NRB Area (an entirely different project area), and by relying on purportedly inefficacious BMPs to limit landslide risks. *See* DE 63-1 at 10–14. Again, in making this argument, Heartwood fails to meaningfully engage with the Record. The Service took several rational steps to avoid repeats of the NRB landslides. First, it conducted a study and survey of the NRB Area, partially in response to Heartwood's sedimentation concerns, which found meaningful geological differences between the two. *See* R. 2064–67 (noting that the SRB area has lower average slopes, less Fireclay and Fireclay Rider coal seams than the NRB areas, and a lower clay profile). That review culminated in a section addressing why the NRB landslides occurred, and specifically addressing how the Service would avoid similar landslides in the SRB Area.[6] *See id.* It proposed adding design criteria to the SRB Project targeting the features

_____

Red Bird Project Soil and Water Specialist Report (Cherry and Cotton, 2020, pp. 16-18) for a discussion of these impacts and the factors that mitigate them."); 1543 (Final EA) ("Stream sedimentation may result from the installation of culverts or AOPs but the impacts would be short-lived and may be offset by the long-term improvements to soil and water resources. There could be stream sedimentation when new roads are constructed, but the impacts will be mitigated by BMPs . . . and Forest Plan Standards.").

[6] The Service found that the landslides occurred from a combination of rooted clay causing water to perch, high slopes, higher average precipitation in the two years preceding the landslides, and increased soil exposure, potentially above the 10% threshold imposed by DB-VEG-26. *See* R. at 2065.

that likely caused the NRB landslides, including preventing heavy equipment from passing over the coal seams at high slopes, marking off protection zones in highly sloped areas, and dropping certain high-risk units from commercial harvests. *See* R. at 2066–67. In some areas, the addendum even proposes exceeding the BMP recommendations to further protect against similar landslides. *See id.* ("Waterbars will be installed at a higher density than BMP recommendations, and will be seeded and mulched as soon as conditions allow for germination. This will reduce the potential for exposed soil and erosion."); *see also* R. at 1590 (Final EA Design Criteria) ("In areas where slopes exceed 35%, install more waterbars on skid trails than prescribed in KY BMPs."). Heartwood may disagree with the approach, as the comments suggest it steadfastly did, or wish that the Service had done more. But "NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (internal quotations omitted). Moreover, the Service's realization of inadequacies in NRB Area BMPs and its move toward stronger protection measures (including the implementation of revised and tested BMPs to be in effect for the SRB Project) bear on its NEPA compliance. *Cf. Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 174 (4th Cir. 2018) (finding NEPA violation where Service, in approving project, "relied on the very mitigation measures it previously found unreliable"), *rev'd on other grounds United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837 (2020).

The Service's careful and candid treatment does not paint the same picture Heartwood sees. The Service learned from the NRB landslides. It surveyed the area on the ground, investigated the root causes, compared the causes and circumstances to the SRB Area, and tailored its approach to

16

avoid the same confluence of factors. NEPA "merely prevents uninformed—rather than unwise— agency action." *Robertson*, 109 S. Ct. at 1846. The Service surpassed the procedural bar.

Heartwood, in a granular critique, also faults the Service's slope calculations for the SRB Area, claiming that the Service acted arbitrarily and capriciously in staying the course after it updated slope errata. *See* DE 63-1 at 12–13. In the Service's initial water and soil report, the Service found that the SRB Area had an average slope of 23%. *See* R. at 2045–46. However, after further scoping and public comment—some of it from Heartwood—the Service later determined that the median slope was 47%. *See* R. at 2099.[7] The Service explained that, despite the slope increase, "[e]ffects to soil and water should remain the same as previously analyzed in the Soil and Water Report because these data were initially used only to describe the Affected Environment of all land within the South Red Bird Project area boundaries." *See* R. at 2100. Although the amended slope calculations did not result in additional design criteria themselves, the Service listed all fourteen design criteria implemented to dampen or eliminate the effects of landslides. *See* R. at 2100–01.

Heartwood views the Service's approach to the corrected slope data as arbitrary and capricious, *see* DE 63-1 at 12–13, but the Court does not. First, Heartwood assumes that the average slope was the only differentiating factor between the SRB Area and NRB landslides. *See id.* at 12 ("[T]he Service did not change its rationale that landslides were less of a risk because the 'median harvest unit slope is not as steep' in the SRB Project area."). But the soil and water addendum specifically addressing the studied NRB landslides makes clear that slope was not the

---

[7] Oddly, the Service described the two numbers differently. The 23% was described as the mean, *see* R. at 2064, while the 47% was described as the median, *see* R. at 2099. That distinction is potentially relevant, as it does not necessarily follow that the mean slope jumped at the same rate as the median after corrections. Nonetheless, that matter does not ultimately prove impactful, as the Service did not act arbitrarily or capriciously either way.

17

only factor to blame. *See* R. at 2064. In fact, the addendum specifically found that the catalyst for several of the NRB landslides "appeared to be a combination of increased precipitation, slope, geology, and skid road placement." *See id.* Heartwood does not meaningfully—really, at all—deal with these other factors, emphasizing only the factor that supports its theory of error. Even further, Heartwood also ignores that the majority of the design criteria the Service implemented apply regardless of the median slope. *See* R. at 2100–01. For example, design criteria 9 commits the Service's Timber Sale Administrator to "work with the timber contractor to minimize waterbars spacing on skid trails with slopes that exceed 35%." R. at 2001. That design criteria protects any area in excess of a 35% slope, so if anything, it means that the stark increase in areas with a slope of more than 40% in the Service's updated calculations will result in *more* protective measures than if the slopes had stayed the same. Similarly, the design criteria prevents skid trails or roads from crossing over Fireclay or Fireclay Rider coal seams when the slope gradient exceeds 35%. Here too, the increase in steep slopes actually increases the criteria's efficacy because more acreage will be subject to the proscriptions.

Heartwood continually avers that the Service found landslides "impossible" in the SRB area when BMPs are used. *See* DE 63-1 at 39. Unsurprisingly, every time it makes the assertion, it omits a Record citation. In fact, the Service did not conclude that landslides could *never* happen in the SRB Project Area with updated BMPs implemented, nor was it required to. Rather, the Service concluded, rationally, that updated BMPs, combined with meaningful differences in geological makeup between the NRB and SRB areas would effectively mitigate the risks of similar landslides. NEPA does not require the Service to eliminate all risks, nor thwart every conceivable environmental event. *See Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 492 (6th Cir. 2014) (NEPA does not require agencies to "consider potential effects

that are highly speculative or indefinite") (citing *Kleppe v. Sierra Club*, 96 S. Ct. 2718, 2726 (1976)). Rather, it implores the Service to take a hard look at possible events, plan reasonably for contingencies, and make rational choices in doing so. The Record shows a Service moored to that calling, not the rogue, shortsighted actor Heartwood makes the Service out to be.

Accordingly, the Service's decision to stay the course after correcting its slope data was neither arbitrary nor capricious. The design criteria targeting sedimentation was at least equally applicable—and in some cases more restrictive given the slope increase—and the soil and water addendum clearly shows that slope alone was not to blame for the NRB landslides.  The Service's engagement on landslide risk and avoidance of negative impact, shown, *e.g.*, in the point-by-point grappling in the Soil and Water Addendum, R. at 2059–94, plainly evinces the required hard look. The document reflects consideration of SRB specifics, NRB contrasts, and the ameliorative role of BMPs on the SRB Project.

### ii.  Forest Makeup Methodology

Heartwood next faults the Service for failing to "take a hard look at the environmental consequences of the Project because it excluded the effects of activities occurring on private lands—activities resulting in the creation of early seral habitat—from its assessment of the existing forest conditions in the Project area." DE 63-1 at 19. The SRB Area is composed of a blend of public and private land. *See* R. at 1514. Of the 55,000 acres that make up the SRB area, about 32,000 acres are public lands managed by the Service, leaving around 23,000 acres of private land. *See* R. at 4. Heartwood complains that the Service had methodological inconsistency, purportedly calculating the percentage of young forest in the SRB Area by excluding private lands, while looking to both private and public portions of the SRB Area in calculating the amount of old growth forest. *See* DE 63-1 at 21. To Heartwood, this approach clouded the Service's

understanding of the necessary amount of ESH creation and prevented the Service from properly analyzing the cumulative effects of the Project. *See* DE 63-1 at 21–23.

In primary support of its argument, Heartwood cites a single map prepared by the Service calculating age class distribution of trees in the SRB Area. *See* R. at 2143. True, this map does appear to exclude private land portions of the SRB Area in the calculation, but Heartwood fails to explain how a single map in an otherwise expansive Record undercuts one of the core tenets of the project: that the SRB Area was critically low on young stands in the 0–10 year age class. *See* R. at 1551–52 (Draft EA) ("The South Red Bird Project area is lacking entirely of forests in the 0-10 year age class while the largest percentage of forest in the project area occurs in age classes greater than or equal to 71+ years . . . . Managing for multiple age classes would benefit the project area by a) providing a diversity of habitats for a wide array of wildlife species; b) improving forest health and vigor in the short and long term in response to natural or man-made disturbances; and c) diversifying age classes to move the project area towards the desired future condition described in the DBNF Forest Plan.").[8] And even assuming the Service did use contradictory methods at times across a Record going back decades, that alone does not make for an arbitrary and capricious decision. *See Nw. Coal. for Alternatives to Pesticides v. U.S. E.P.A.*, 544 F.3d 1043, 1051 (9th Cir. 2008) ("[T]he mere fact that the [agency] might have adopted 'internally inconsistent' positions throughout the decision-making process d[oes] not render the final decision arbitrary and capricious."). Heartwood, even in its objections, conceded both the importance of and empirical bases for pursuit of the ESH goal. *See* R. at 2539 (Heartwood's Comments to Draft EA) ("Early

---

[8] *See also* R. at 2184 (Vegetation Report) (noting that between 1996 and the present, the "most notable change" in the SRB Area is "the increase in overall age of stands and the entire loss of stands in the 0-10 year-old age class"); R. at 2187 ("Young forest and young forest structures are dwindling. Young forest (0-10 years) is inherently underrepresented within the project area. A combination of these factors is causing the forest to lose its capacity for renewal and resilience to a range of disturbances.").

seral habitat (ESH) is clearly important to a wide range of species, and is objectively at very low levels in the project area. Commenters do not object to active management for the development and maintenance of ESH per se.").

Setting aside the map, the Service clearly planned its seral habitat targets to include the entire SRB Area. Throughout the Project, one of the Service's oft-repeated goals was to create between 5–6% of EHS in the SRB Area, consistent with 2004 Forest Plan objectives. *See, e.g.*, R. 1375 (Forest-Wide Goals and Objectives) ("Maintain 5 to 6 percent within each 5th level watershed in the 0-10 age class, including the effects of catastrophic events."); R. at 2192 ("Action 1: Early seral/young forest habitat: Create approximately 2,255 acres of young forest habitat (0-10 years old) using the following methods . . . ."). And in implementing that objective, the Service calculated its ESH targets for the entire SRB Area, not just public lands. *See* R. at 2128–30 (finding, in response to Heartwood's objections, that an estimated 1,100 acres of private-land commercial harvesting would occur over the life of the project, and that even if all actions were implemented in one year, that SRB project would still fall within Forest Plan standards). As noted, the SRB Project called for the creation of 2,255 acres of ESH. *See* R. at 1547 (Final EA) (noting that "to encourage oak regeneration and recruitment in the South Red Bird IRMA, approximately 2,225 acres of early seral habitat and site preparation is proposed"). Thus, even adding the 1,100 acres of estimated private timber harvesting, the 3,355 acres of combined private and public harvesting still easily complies with pursuit of Forest Plan standards. *See* R. at 1588. That is not arbitrary and capricious; it is proper planning.[9]

---

[9] Heartwood contends that the Service "omit[ed] analysis of harvest activities on private lands that generate ESH." DE 63-1 at 21. The Record disagrees. The Service always planned for and anticipated private land timber harvesting and its associated environmental effects. *See* R. at 1567 (final EA) (estimating amount of private timber harvesting to occur over the life of the SRB project and considering it a "foreseeable future activity" to occur within the SRB Area); R. at 1569 ("Future increases in stream sedimentation might be

In its summary judgment reply, Heartwood takes great issue with the Service's combined private and public ESH calculations. *See* DE 77 at 8–11. It complains that the total amount of expected timber harvest, after accounting for public land harvests and private land harvests, becomes 5,220 acres "when the 1,400 acres from other Service projects are added in." *See id.* at 10. Confusingly, it adds 1,400 acres of ESH from the NRB Project into the ESH calculation for the SRB Area to reach its purported criticized total. *See id.* at 10 n. 17. But it fails entirely to explain why 1,400 acres from a distinct project area should be included in the ESH calculation for the SRB Area. The Service, from the beginning, calculated its ESH goals with reference only to the 55,000 acres of private and public lands that make up the SRB Area. *See e.g.*, R. at 1547; 1588. Heartwood cannot just add, without any justification, ESH acreage from a separate project area (one that would, of course, change the overall math on the ESH goal, given the inclusion of the boundary of the NRB area) that never featured in the Service's calculations and suddenly claim error.[10]

### iii.  Oak Recruitment

As Heartwood's final NEPA claim, it asserts that the Service's approach to oak recruitment was arbitrary and capricious because the Service "knew the on-the-ground application of the

---

caused by continued land use changes on private lands, vegetation management treatments on NFS and private lands, and potential mining activities on private lands."); R. at 1572 ("Future increases in stream sedimentation might be caused by continued land use changes on private lands, vegetation management treatments on NFS and private lands, and potential mining activities . . . .").

[10] On forest age, Heartwood also disputes the Service's stand-level calculations. The Service prepared a Common Stand Exam report, which examined age, species, and other details of individual tree stands in the SRB Area between 2007 and 2017. *See* R. at 97–967. While some of the details are in the Record, "[s]tand data are also analyzed using Geographic Information Systems (GIS), which produces raw spatial data that is generally not readable to laypersons or the court. Therefore, the parties agreed to exclude the data from the administrative record." DE 60 at 4. Heartwood now argues that the Service's data were incorrect, based primarily on surveys Heartwood itself conducted post-decision. *See* DE 68 at 9–10; R. at 5017–5041 (February 2022 supplemental letter arguing stand calculation errors). Because this claim concerns the Service's treatment of Heartwood's post-decision supplemental materials, the Court addresses it separately with all other post-decisional claims. *See infra* Section (II)(d).

Service's preferred project alternative for oak recruitment wouldn't work" and because it failed to analyze proper alternatives. *See* DE 68 at 16–18.

The Service, in crafting the SRB Project, recognized a decline in oak recruitment in the SRB Area, which in its view, could "threaten[] sustaining oak species as a major component of future forests and could limit hard mast forage for wildlife that eat acorns." *See* R. at 1515. Accordingly, the Service proposed several remedial measures to cure declining oak recruitment and foster new growth. Those measures included, among others, thinning of mid-story canopies to offer suppressed oak saplings access to sunlight, cutting of stunted oak saplings to encourage new growth under more conducive conditions, and planting of oak and other mast producing trees in areas where oak regeneration is lacking. *See* R. at 1517–19.

Heartwood contends that these approaches were arbitrary and capricious. *See* DE 16–18. Chiefly, it argues that the Service "had data that its prior implementation of a near identical oak recruitment shelterwood harvest didn't recruit oak like it thought it would." *See id.* at 16. It cites to a comment submitted to the Service by Jim Scheff claiming that a survey of plots harvested in the Redbird District between 1985 and 1994 shows that oak recruitment was ineffective. *See* R. at 2536–38. The Service engaged with Heartwood's comments in its comment responses. *See* R. at 3327–28. It explained that red maple and poplar "often outcompete oak after a shelterwood treatment," which is why "surface herbicide application to maples and prescribed burning are included in the proposed action in most of the tree cutting activities—to reduce maple's ability to resprout and out-compete oak regeneration." *See* R. at 3327. Further, it explained that "several activities use herbicide treatment of maples and/or prescribed burning . . . to address the maple advantage," and that "in response to Scoping Comments, group selection was added to the

proposed action . . . [to] provide[] [a] rationale as to why the group selection treatment is proposed in noncommercial midstory units rather than in the commercially harvested stands." R. at 3328.[11]

In sum, the oak recruitment dispute comes down to a disagreement in approach. Heartwood would have the Service stop thinning and removal altogether, while the Service sees the move as a necessary step to ensure the longevity of mast-producing trees like oak. Moreover, the Record shows that the Service engaged with scoping comments, dealt with an evolving understanding of forest management over time, and offered a sufficient rationale for its approach. That Heartwood desired a different direction is not probative. The Court will not delve into, let alone resolve, this complicated silviculture issue. Instead, on APA review, it is sufficient that the Service perceived a challenge, posed a solution reflecting its expertise, and tailored that solution based on public comment where it deemed apt. That, again, is consistent with NEPA and § 706(2) review.

**b.  NFMA**

Heartwood next invokes NFMA, claiming that the Service's plan failed to adequately consider Forest Plan standards, particularly the DB-VEG-26 standard, and that the Project does not adequately ensure future compliance. *See* DE 63-1 at 23–26.

---

[11] Heartwood's complaint about alternatives is, at times, hard to follow. It cites to a portion of the Draft EA that addressed forest health. The single, isolated paragraph Heartwood relies on explains that the Service chose one thinning method over another, in part, because the alternative was "cost-prohibitive at a landscape level, with little wood product removed in comparison to the amount of work it would take to obtain it." *See* R. at 1475. First, it's not at all clear what this sentence has to do with oak recruitment. It may be tangentially related in that midstory removal and thinning was one aspect of the Service's approach to cultivate oak recruitment. However, this paragraph does not seem to deal directly with the issue. Moreover, Heartwood conveniently leaves out the preceding sentence, which noted that the alternatives would "require multiple entries with heavy machinery into each stand several times throughout the life of the project, disturbing the soil, damaging trees, and increasing the risk of invasive species with each entry." *See id.* These are all concerns Heartwood accuses the Service of ignoring in other contexts, so its bears mentioning that Heartwood strategically omits the Service's consideration of the factors only when it suits its present assertion. In any event, nothing Heartwood cites presents a convincing argument for the asserted failure to adequately consider alternatives.  And cost, as a matter of common sense, always bears on alternatives.

The National Forest Management Act (NFMA) tasks the Forest Service to develop land management plans for units of the National Forest System in conjunction with state governments, local governments, and other federal agencies. *See* 16 U.S.C. § 1604(a). The plans must be tailored to each unit of the National Forest System, prepared by an interdisciplinary team, and subject to revision when unit conditions have changed, or at least every fifteen years. *See* § 1604(f)(1)–(5). In proposing and implementing any project within the plan area, the project must be "consistent with the plan[,]" and if inconsistencies arise, the responsible official must either reject or modify the project to ensure compliance. *See* 36 C.F.R. 219.15(c)–(d).

Prior to the SRB Project, the Service last revised the DBNF Management Plan in 2004. *See* R. at 4127. The main thrust of the revisions, according to the Service, was to "guide coordination of multiple uses (such as outdoor recreation, minerals, timber, watersheds, fish and wildlife, and wilderness, etc.) and promote sustained yields of products and services on the DBNF." R. at 4133. As part of the plan, the Service developed several forest-wide standards relating to vegetation. *See* R. at 4166–69. That portion of the plan includes standard DB-VEG-26—the standard Heartwood challenges. *See* R. at 4168. DB-VEG-26 simply requires that "[n]o more than 10 percent of a harvest area should be in landing, skid roads, or exposed soil." *See id.* It offers no guidance on what a harvest area should include, nor what should be considered landings or skid roads. Those matters, apparently, are left to the implementing authority. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). ("[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference.").

Heartwood challenges the Service's implementation and observation of DB-VEG-26 in the SRB Area and the Project. *See* DE 63-1 at 23–26. It asserts that the Service failed to "calculate[] how much exposed soil will be in individual harvest areas" and that the Record is unclear about

"whether the Service intends to impose monitoring requirements to assess the actual amount of exposed soil during project activities[.]" *See id.* at 24. The Record shows otherwise.

First, Heartwood directs the Court to a briefing paper prepared by the Service that allegedly demonstrates the Service's inadequate consideration and implementation of the DB-VEG-26 standard. That paper is one of several documents the Service inadvertently uploaded to a public folder accessible by Heartwood, which then sought to supplement the Record with the document. *See* DE 61. The Court has twice dealt with this issue, both times denying Heartwood's supplementation request, and it will not deal with it again. The "focal point" for review is the record already in existence, not a new record spliced together for the reviewing court. *See Florida Power & Light Co.*, 105 S. Ct. at 1607. The briefing paper is not part of the Record, so the Court simply disregards any argument based on its contents.

Outside the paper, Heartwood asserts that the Service has no "working definition" for implementing DB-VEG-26 and no rationale for ensuring that the SRB Project will comport with the Standard. *See* DE 63-1 at 26. Heartwood raised similar objections during the notice and comment process. *See* R. at 3355. It claimed that the Service's plan would have applied the 10% threshold across the "entire project area," potentially leaving some individual areas well over the 10% threshold, so long as the whole project area "averaged out." *See id.* It was also concerned with whether the Final EA's assessment that "no more than 392.5 acres of soil may be exposed," *see* R. at 1538, applied to a harvest unit, a sale, or the entire SRB Area. *See* R. at 3355.

The Service meaningfully considered and dealt with this objection, providing clarity on how the 10% threshold applied and how it would be monitored throughout the Project. *See* R. at 2119–21. It added to the Record, through objection responses, a table documenting each individual stand within the SRB Area, the number of acres available in the individual area, the maximum

amount of exposed soil allowed to comply with DB-VEG-26, and the remaining acres in each stand after accounting for the 10% threshold. *See* R. at 2119–20. Further, the response resolved Heartwood's definitional concerns, noting that the 10% threshold applies "at both the stand level and the project level," *see id.* at 2119. That foreclosed Heartwood's application objection and ensured that the Service cannot simply allow harvesters to raze one area so long as it leaves a sufficient and mathematically balanced portion of some other area alone. Further, at Heartwood's suggestion, the Service incorporated 31.7 acres of oil and gas well roads not previously included in the calculations. *See* R. at 2121.

Heartwood largely ignores the response. It does not assert that the calculations are incorrect, leave out necessary areas for calculation, or otherwise fail to properly administer the DB-VEG-26 standard. Rather, it merely asserts, without citation or explanation, that the service has "no rationale for ensuring that the SRB project will be consistent with" DB-VEG-26. *See* DE 63-1 at 26; *see also* DE 68 at 12–15 (copying and pasting much of its summary judgment argument and asserting again that "[t]here is an absence of information in the Record that shows the Service calculated how much exposed soil will be in individual harvest areas"). Indeed, from the Court's view, Heartwood does not even cite to the Service's objection response dealing specifically with the issues Heartwood raises. Turning a blind eye to information that undercuts Heartwood's stance does not a winning position make.

Heartwood's NFMA challenge also implicates deference principles routinely applied by federal circuits to forest plan standards. Heartwood continually asserts that the Service has no "working definition" for the DB-VEG-26 standard. And while it's true that the Standard itself does not define how the 10% threshold should be measured, the Service determined that it should be measured at both the Project level and the stand level. *See* R. at 2119.  That rational interpretation

is entitled to "substantial deference." *See Native Ecosystems Council*, 697 F.3d at 1056; *Cherokee Forest Voices v. U.S. Forest Serv.*, 182 F. App'x 488, 494 (6th Cir. 2006) ("Substantial deference is due to the Forest Service's interpretation of a Forest Plan."); *Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999) (Forest Service's interpretation of its Forest Plan should receive "great deference"); *Lamb v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001) (same) (citing *Sierra Club*, 168 F.3d at 4)). Thus, Heartwood's complaints about a lack of a "working definition" for DB-VEG-26 are simply unfounded on the Record, and the Court defers to the Service's definition and implementation of the DB-VEG-26 standard as applied at the stand and Project levels.

Finally, Heartwood complains that the Service "cannot determine whether the project will comply with" DB-VEG-26. *See* DE 63-1 at 26; DE 68 at 15 ("The Service is in violation of NFMA and NEPA because it has no working method to ensure its site-specific plans comply with the governing Forest Plan Standard DB-Veg-26, nor has it articulated one."). Again, this ignores Record evidence. Borrowing and learning from previous projects where the 10% threshold was inadvertently exceeded in at least one project unit, the Service implemented additional design criteria to the SRB Project, requiring documentation of "linear measurement of skid roads and an estimate of landing size . . . by the sale administration team during project operations." R. at 2121 (explaining that the design criteria was added to strengthen "[t]he feasibility of avoiding the 10% threshold"). It's difficult to imagine what more Heartwood wishes of the Service. The added design criteria imposes in-project monitoring on harvesters, providing the Service ongoing confirmation of DB-VEG-26 compliance—this, in addition to the Service's stand-level limitations. *See* R. at 2119–20.

The Service's approach to the DB-VEG-26 standard was not arbitrary or capricious. The Service considered the standard throughout the planning process, reasonably defined how the

Service would apply the standard, and implemented strengthened design criteria to facilitate compliance. NFMA requires no more of the Service, and thus, Heartwood's claims fall short.

### c. ESA

Finally, Heartwood challenges the Service's conduct under the Endangered Species Act (ESA). It primarily argues that the Service "failed to ensure against species jeopardy by failing to utilize the best available scientific and commercial data" in carrying out its ESA obligations and that the Service wrongfully failed to engage in formal consultation with FWS following an adverse impact finding. *See* DE 63-1 at 26–40.

Congress enacted the ESA in 1973 "to protect and conserve endangered and threatened species and their habitats." *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2526 (2007). With conservation in mind, the ESA "provides a procedural framework for Federal agencies to analyze whether any proposed action 'may affect' the listed species or critical habitat." *Framework Heartwood, Inc. v. Agpaoa*, 611 F. Supp. 2d 675, 682 (E.D. Ky. 2009), *rev'd on other grounds* 628 F.3d 261 (6th Cir. 2010). Generally, an agency proposing an action must first determine whether the action "may affect" listed species. 50 C.F.R. § 402.14(a). Then, if the agency determines that its action "may affect" a protected species or its habitat, it must consult with the Fish and Wildlife Service (FWS) to ensure that the proposed actions are not likely to jeopardize the continued existence of any listed species. *Id.* at § 402.14.

If consultation is required, ESA regulations contemplate two forms: formal and informal. *See* 50 C.F.R. §§ 402.13, 402.14(a), (b). Informal consultation generally consists of discussions and correspondence between the agency and FWS. *See* 50 C.F.R. § 402.13(a). If, during informal consultation, the agency determines, and FWS concurs in writing, that the proposed action is "not likely to adversely affect" a listed species, consultation is complete and formal consultation is

unnecessary. *Id.*; *see also Kentucky Heartwood, Inc. v. Worthington*, 20 F. Supp. 2d 1076, 1084 (E.D. Ky. 1998). If, on the other hand, during informal consultation the agency determines that its actions "may affect" listed species, then the agency must request initiation of formal consultation with FWS, unless FWS determines, through a biological assessment, that the proposed action is not likely to adversely affect any listed species or critical habitat. *Id.* at § 402.14(a), (b).

This potential consultation obligation remains ongoing throughout the life of agency action. Reinitiation of formal consultation is required and shall be requested by the agency "[i]f the amount or extent of taking specified in the incidental take statement is exceeded" or "[i]f new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered[.]" *Id.* at § 402.16(a)(1)–(2).

The arbitrary and capricious standard applies in this setting too. "[T]he standard for demonstrating that an agency was arbitrary and capricious in failing to reinitiate consultation is an exacting one." *Heartwood, Inc.*, 611 F. Supp. 2d at 683.

The parties agree that the SRB Project had the potential to affect five listed species: the Northern Long-eared bat, the Indiana bat, the Gray bat, the Kentucky Arrow Darter and the Snuffbox mussel. *See* DE 60 at 21; DE 63-1 at 27. The Service was aware of the presence, or at least the potential presence, of all five species in the SRB Area. In a preliminary Wildlife Resource Report prepared by the Service, the Service explicitly identified all five species as some of 26 listed species "potentially occur[ing] on or adjacent to the Daniel Boone National Forest." *See* R. at 2292–94. The Report marked the Gray bat as a species for which "the project and associated activities are outside of the historical range, the species has no documented occurrences, or suitable habitat does not exist." *See* R. at 2293–94. For the other four species, the report identified them as having some documented occurrences and some suitable habitat within the SRB Area. *See id.* at

2292–94. The Report further identified a Designated Critical Habitat for the Kentucky Arrow Darter, including 38 units of the SRB Area that were "essential to the conservation of the species" and subject to special management considerations. *See* R. at 2294. The Report then lists each unit individually, including details of the exact locations of the DCH areas. *See* R. at 2294–96.

This treatment made its way into the Service's draft Biological Assessment (BA) and Evaluation—the document then used by FWS to assess the Service's ESA compliance. *See* R. at 2326–75. The Draft BA specially considered potential effects and environmental considerations for the Northern Long-eared bat, the Gray bat, and the Indiana bat. *See* R. at 2358–60. It concluded that, while project operations could have some effects on the species—mostly the Northern Long-eared and Indiana bats—that the effects would be primarily confined to daytime operations when bats are less active, the Project would not affect winter habitats, and would not affect hibernacula because no commercial activities would be permitted within a ¼ mile of any known hibernaculum. *See id.* As for the Kentucky Arrow Darter, the Service anticipated that there would be "slight, temporary increases to erosion" from proposed logging activities, but that the effects would be limited through implementation of BMPs and forest plan standards. *See* R. at 2361. Finally, the Service concluded that impacts to the Snuffbox mussel would be limited, for one because the mussels, although present, are not common in the area, and also because, as aquatic species, they would benefit from the same associated protections as the Kentucky Arrow Darter. *See* R. 2362.[12]

Importantly, FWS concurred with the Service's Biological Assessment in full, and with particular regard to the five species of Heartwood's focus. *See* R. at 2387. First, FWS agreed with

---

[12] This is a truncated overview of a detailed and complex analysis. The Service's full Biological Assessment as to these five species spans several pages, considering potential effects to the species from sedimentation, prescribed fires, thinning, herbicide, and more. Notably, Heartwood does not delve much into the details on these issues. It hovers above the Service's complex and careful consideration, broadly crying foul about "commercial and scientific data" without meeting the Service's deep travel into the weeds.

the Service's determination that the Project would have no effects on the Snuffbox mussel, finding a lack of suitable habitat in the Area and with "no additional comments or concerns" about the species. R. at 2387. Next, it agreed with the Service that the SRB Project had the potential to affect the four other species and provided individual determinations and comments for each. It concluded that although there were potential—and in one case even likely—adverse effects on the Indiana bat and the Northern Long-eared bat, that the Project was within the limits of acreage set aside for incidental take previously set by FWS's Biological Opinions (BiOP). *See* R. at 2387–88. Next, FWS agreed with the Service that, due to the lack of limestone caves/karst present in the SRB Area, the Gray bat's nocturnal characteristics, and the unlikelihood of significant populations of bats in the Area, that the SRB Project was not likely to adversely affect the Gray bat. *See* R. at 2388–89. Finally, it agreed that, through best management practices, land standards, and design criteria, that the SRB Project was not likely to adversely affect the Kentucky Arrow Darter. *See* R. at 2389. FWS concluded that it "believe[d] that the requirements of Section 7 of the Endangered Species Act of 1973, as amended, are fulfilled as they pertain to this project." *See id.*

### i. Best Available Data

Heartwood claims that the Service abdicated its ESA responsibilities in failing to use the "best available scientific and commercial data available" in consulting with FWS. *See* DE. 63-1 at 27–36.

The ESA obliges agencies engaging in formal consultation to provide FWS with "the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." 50 C.F.R. § 402.14(d); *see also* § 402.14(g)(8) (imposing similar obligations on FWS in formulating biological opinions following formal consultation).

First, Heartwood claims that the Service defaulted its obligations by failing to sufficiently consider the effects of White Nose Syndrome (WNS) as it related to Indiana bats and Northern Long-eared bats. *See* DE 63-1 at 30–31. It complains that the Service wrongly looked to previous biological opinions that did not sufficiently address the effects of WNS. *See id.* at 30. Again, this view misleadingly isolates portions of the Record sympathetic to Heartwood. The Service expressly recognized the devastating effects of WNS on bat populations in its final Biological Assessment, *see* R. at 2456, and FWS heavily considered WNS in its 2016 BiOp, later used to concur with the Service's draft Biological Assessment as to this Project, *see* R. at 2387–88, 3455–57. Thus, Heartwood fails to indicate what the issue is, for a phenomenon widely reflected in the Record. Citing one previous BiOp that did not address WNS,[13] when all signs show that FWS and the Service were separately well aware of the issue during consultation, does not make for a lack of best available data, and Heartwood offers no authority to conclude otherwise.[14]

Next, Heartwood takes issue with the Service's supposed refusal to credit a single master's thesis analyzing the effects of logging on the NLEB, cited by Heartwood in an objection. *See* DE 63-1 at 30–31; R. at 3372. The thesis, published by a student at the University of Kentucky, addressed the "effects of shelterwood and patch cut harvest" on WNS-affected bats in Eastern Kentucky. *See id.* By Heartwood's own admission, none of the areas studied, even if in Eastern

---

[13] Likely because the North American WNS outbreak had yet to occur at the time FWS issued the previous BiOp. *See* National Park Service, *What is White Nose Syndrome?*, https://www.nps.gov/articles/what-is-white-nose-syndrome.htm (last visited Feb. 28, 2025).

[14] On another bat-related thread, Heartwood claims that the Service "acted as if [gray bats] were not present in the SRB Project area," DE 63-1 at 10, but that's just not true. The BA found that Gray bats were less likely to be present in the SRB Area because they "associate with Limestone caves" and "Limestone is scarce on the Redbird District." R. at 2456. Further, because Gray bats primarily hibernate in caves, and there were "no known cave systems within the proposed burn areas," R. at 2457, there was less concern that the arboreal aspects of the Project would affect the species. *See id.* Naturally, because Gray bats were less susceptible to potential impacts, they required less discussion than Indiana bats and Northern Long-eared bats, which forage in trees during the summer. *See* R. at 2456. Thus, any comparatively cursory treatment of the Gray bat was a mere product of the individual characteristics of that species, not an arbitrary omission.

Kentucky, were within the SRB area. *See* R. at 3371–72. Nonetheless, Heartwood faults the Service for not making the thesis a cornerstone in its analysis and decision. *See* DE 63-1 at 30–31. Notably, Heartwood does not cite a case showing that an agency's failure to consider a single report submitted by an objector amounts to a best evidence issue.[15] Indeed, the Court struggles to see how an agency could get anything done if required to start the analysis anew every time a master's student published a tangentially relevant paper. And in any event, it is not the Court's role to play scientist for the Service, requiring it to justify its choice among studies and "explain every possible scientific uncertainty." *See The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008). The Service was aware of and adequately considered the WNS implications on the bat populations involved.

Heartwood also claims the Service failed to utilize the best available evidence as to the Snuffbox mussel and the Kentucky Arrow Darter because the Service "only ever made an arbitrary and capricious decision concerning the SRB Project's risks of landslides without ever taking the step to consider their impacts." *See* DE 63-1 at 34–35. That's just not true, on the Record plausibly read. As the Court has discussed at length, the Service took a hard look at sedimentation risks in the SRB Area. It tasked field agents to study the NRB landslides, determined their likely causes, and implemented enhanced design criteria and evolved BMPs to address the issue prospectively in the distinct SRB Area. That is not an arbitrary and capricious decision; it is a well-informed, measured approach, compliant with the Service's statutory and regulatory obligations.[16]

---

[15] In fact, Heartwood goes on an impressive 10+ page run in this portion of its summary judgment motion without citing a single case to support its views, other than merely repeating *State Farm*'s directive that agencies must demonstrate a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 103 S. Ct. 2856, 2871 (1983).

[16] Heartwood relatedly complains that FWS wrongly concurred with the Service's no adverse impact finding on the Snuffbox mussel because FWS did not reference the species's presence in the SRB Area. *See* R. at 2387. But, again, a lack of suitable habitat (the FWS reference) does not mean that the species

### ii. Failure to Formally Consult FWS on Indiana bat and Northern Long-eared bat

In its final ESA claim, Heartwood contends that the Service's adverse effect finding required formal consultation as to the Indiana and Northern Long-eared bats. *See* DE 63-1 at 29.

At first blush, this argument appears to have some force. Formal consultation with FWS is required any time an agency determines that a proposed action is likely to adversely affect a listed species. *See* 50 C.F.R. § 402.12(a), 402.14(a). The Service unequivocally found that the SRB Project was likely to adversely affect the Indiana bat and the Northern Long-eared bat, specifically during summer timber operations and prescribed burns. *See* R. at 2461–62. And the Service only informally consulted with FWS in preparing the draft and final BAs. *See* R. at 2451, 2291.

However, the Service's analysis and FWS's concurrence indicate that the decision was the product of past formal consultation with FWS, properly culminating in BiOps addressing incidental take of the Indiana and Northern Long-eared bats. The Service explained in its Draft BA that the Project was designed to comply with two previous BiOps issued by FWS specifically addressing adverse effects and incidental take of the two species. *See* R. at 2423–24, 2439. FWS concurred with that understanding, noting that the proposed plans were within the scope of incidental take prescribed by the prior BiOps. *See* R. at 2388–89.

---

will never find its way into the SRB Area. As Heartwood even admits, *see* DE 63-1 at 34, the Service readily notes the presence of Snuffbox mussel at a few sites in the SRB Area. *See* R. at 1562, 2362, 2426. It would be one thing if the Service ignored their presence entirely. But the Service was aware of their presence, referenced it, and still made a rational, no effect finding based on its sedimentation analysis. *See* R. at 2311–12 ("No direct effects are expected because this fish and mussel are aquatic and the proposed actions all occur on terrestrial sites . . . . There would be slight, temporary increases in erosion from the proposed activities but through implementation of [BMPs], the sediments would not likely reach the streams."); *see also* R. at 1562 (Final EA) ("The snuffbox mussel is documented in six locations in the Red Bird River, but critical habitat has not been designated for this species . . . . No direct effects are expected from the proposed action because this is an aquatic species and the proposed actions all occur on terrestrial sites."). Any perceptual error by FWS, relative to the no effect finding, is inconsequential on this Record.

There is no doubt that prior formal consultation occurred regarding these two species. After all, that is the only reason FWS would issue a BiOp. *See* 50 C.F.R. 402.14(m)(1) ("Formal consultation is terminated with the issuance of the biological opinion."). And cases support that the Service may rely on programmatic biological opinions—those developed across an entire program, rather than a site-specific project—to satisfy its ESA obligations.[17] *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067–68 (9th Cir. 2004) (finding that Service could properly rely on programmatic BiOps to satisfy ESA obligations and noting that FWS need not "reinvent the wheel" with a site-specific BiOp); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1130 (N.D. Cal. 2017) (requiring reinitiation of formal consultation only after project exceeded incidental take rates from a programmatic BiOp); *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1133, 1155 (D. Mont. 2014) (finding that Forest Service could rely on programmatic BiOp in its jeopardy analysis because the record showed that the Service drafted an amended BA specifically addressing site-specific considerations of listed species); *Buckeye Forest Council*, 378 F. Supp. 2d at 844 (allowing reference back to BiOp addressing incidental take of Indiana bats to satisfy ESA obligations of site-specific project).[18] Likewise, an agency need only reinitiate formal consultation with FWS if the agency is aware that the incidental take prescribed by the BiOp is or will be exceeded in the project area. *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (only if "the amount or extent of taking specified in the ITS is exceeded" must an agency reinitiation formal consultation); 50 C.F.R. 402.16(a)(1) (reinitiation of formal consultation necessary where "the amount or extent of taking

---

[17] The BiOps here fall within the programmatic category. FWS expressly lists one as a programmatic opinion, *see* R. at 2388, and the other was crafted to implement the 2004 DBNF Forest Plan, not a site-specific project. *See id.*

[18] Heartwood does not challenge the propriety of the two underlying BiOps.

specified in the incidental take statement is exceeded"). There is no such suggestion on the current Record.

Thus, the Court finds no error. The Service designed the Project to fit within the programmatic BiOps, *see* R. at 2423–24, and FWS concurred, finding that the Service properly complied with prescribed incidental take limits laid out from the previous consultative processes. This concurrence has weight, and FWS has not balked at the Project or requested reinitiation of consultation on any of the species. *See Wyoming Outdoor Council v. Bosworth,* 284 F. Supp. 2d 81, 95 (D.D.C. 2003) ("Given its independent duty to request initiation when warranted, the FWS will presumably speak up if conditions requiring reinitiation arise."). There is no indication that incidental take levels as laid out in those opinions have been or will be exceeded in the SRB Project Area, and Heartwood does not offer reason to believe otherwise. At base, the ESA requires federal agencies to ensure that any agency action "is not likely to jeopardize the continued existence of any endangered or threatened species . . . ." 16 U.S.C. § 1536(a)(2). FWS previously determined that certain activities in the DBNF would not upset that basic aim, and the Service here ensured that the SRB Project would fit within those confines. Nothing more is required of it under the ESA.

### d.  Supplemental Information

Several of Heartwood's claims of error rest on supplemental information it provided to the Service following the Service's Final Decision. In February 2022, nearly a year after the Service issued its Final Decision, Heartwood submitted a 45-page letter, accompanied by another 1,500+ pages of supporting material, concerning the SRB Area and the SRB Project. *See* R. at 5001–45. The letter alleges a whole host of supposed errors based on purportedly new information concerning the SRB Area and the SRB Project. It claims, much like Heartwood's comments during the scoping and notice and comment processes did, that the Service's EA and FONSI were based

on "incomplete and flawed information," specifically regarding the Service's analysis of sedimentation and ESA-listed species. *See* R. at 5018; 5039; 5041. It also asserts that the Service wrongly calculated stand ages throughout the SRB Area. *See* R. at 5017–37. Heartwood concludes the letter with a directive that the Service must either "drop the actions that were inadequately analyzed or, at the least, pause implementation of the South Red Bird project and prepare and publish a supplemental EA transparently disclosing the impacts and risks that the prior documents have obscured." *See* R. at 5044.

 The Service confirmed receipt of the supplemental information on March 4, 2022. *See* R. at 6677. Claybrook reported that he had "read the supplemental letter" and "plan[ned] on sharing [the] information with the appropriate resource specialists." *See id.* Claybrook emailed Heartwood expressing an interest in discussing the letter through a phone call, *see* R. at 6678, which later occurred. *See* DE 60 at 15. Outside of this correspondence, however, the Service took no Record-documented action based on the supplemental information. Heartwood then, post-litigation, filed another supplemental letter with the Service in November 2022, which addressed purported effects of wildfires on the SRB Area. *See* R. at 6710–23. This letter received no Record-documented acknowledgement from the Service.

Heartwood argues the Service abdicated NEPA obligations by failing to craft a Supplemental Environmental Impact Statement (SEIS) based on the supplemental information. *See* DE 63-1 at 15–19. Specifically, it argues that the Service ignored information concerning new landslides in the NRB Project Area and that it "took no action" when Heartwood presented evidence that Indiana bats, Northern Long-eared bats, and Gray bats were confirmed to be present

in the SRB area in the summer of 2021. *See id.*[19] It further argues that the Service was required to reinitiate consultation under ESA because the supplemental information offered reason to believe that listed species were present in the Area and would be affected to a greater extent than the Service's decisional documents already contemplated. *See* DE 63-1 at 36–40.

An agency's NEPA and ESA obligations do not end at the issuance of a final decision. An agency must prepare a SEIS, supplementing a previous EIS "if a major Federal action is incomplete or ongoing, and: [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns or [t]here are significant new circumstances or information relevant to the environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(i) (2020) (version then in effect). Consistent with other NEPA obligations, this additional requirement compels agencies to "take a 'hard look' at the environmental effects of their planned action, even after the proposal has received initial approval." *Marsh*, 109 S. Ct. at 1859. On the other hand, agencies need not supplement a SEIS every time new information comes about. *See id.* "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision was made." *Id.* Thus, the decision whether to supplement an EIS is itself subject to the familiar arbitrary and capricious standard. *See id.* at 1860; *see also Sierra Club*, 120 F.3d at 633.[20]

---

[19] This sequence has appeared before in Heartwood litigation. *See Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835, 844 (S.D. Ohio 2005) ("[Buckeye Council and Heartwood] argue that after the Forest Service discovered the presence of the Indiana bat in the Wayne National Forest, the Forest Service was required to prepare a supplemental EIS regarding the continued implementation of the Forest Plan.").

[20] The standard is somewhat similar for ESA issues. Reinitiation of formal consultation "is required and shall be requested by the Federal agency" if "the amount or extent of taking specified in the incidental take statement is exceeded," or if "new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered." *See* 50 C.F.R. § 402.16(a)(1)–(2). The general idea is that, regardless of whether a claim proceeds under ESA or NEPA, the Service must be open to new information, and where it rises to a level sufficient to justify action, take corrective measures and otherwise account for the new information.

Initially, Heartwood fails to show that SEIS obligations even apply in this setting, given that the Service only prepared an EA. The relevant regulatory authorities, along with the cases Heartwood cites, all contemplate, logically, that a SEIS follows a previous EIS. *See, e.g.*, 40 C.F.R. § 1502.9(d)(1) (agencies "shall prepare supplements *to either draft of final environmental impact statements* if Federal action is incomplete or ongoing . . .") (emphasis added). Here, the Service stopped short of an EIS, finding that an EA and a FONSI satisfied its NEPA obligations. Thus, the regulations Heartwood invokes do not strictly govern.

That, however, does not fully insulate the Service's decision to forge ahead despite the supplemental information. An agency's decision not to take a certain action, as a § 706(2) matter, is still commonly subject to the arbitrary and capricious standard.[21] *See Marsh*, 109 S. Ct. at 1860 ("We conclude that review of the narrow question before us whether the Corps' determination that the FEISS need not be supplemented should be set aside is controlled by the 'arbitrary and capricious' standard of § 706(2)(A)."); *Kelley*, 42 F.3d at 1518–19 (an agency's decision not to prepare an EIS "can be overturned only if it is arbitrary, capricious, or an abuse of discretion" and must be "reasonable under the circumstances when viewed in the light of the mandatory requirements and the standards set by the NEPA") (internal quotations omitted). Thus, regardless of whether the agency went on to prepare an EIS or stopped only at an EA and FONSI, the agency must still take a "hard look" at whether the "new circumstances will significantly differ" from

---

[21] Heartwood's complaint also presents this issue as agency inaction unlawfully withheld under § 706(1). *See* DE 22-1 at 73–75. However, Heartwood omits any § 706(1) argument from its dispositive motions briefing. Heartwood frames the standard continually as an arbitrary and capricious matter. Thus, the Court deems any § 706(1) argument waived. And in any event, an agency's decision not to prepare an SEIS—or some other report addressing supplemental information—is not actionable on a 706(1) theory. *See Black Warrior Riverkeeper, Inc. v. Alabama Dep't of Transportation*, No. 2:11-CV-267-WKW, 2016 WL 233672, at *11 (M.D. Ala. Jan. 19, 2016) ("The issuance of a SEIS is not a ministerial or nondiscretionary act. Rather, whether to issue a SEIS is, of necessity, a decision that 'requires a high level of expertise' that is committed to 'the informed discretion of the responsible federal agencies.'") (citing *Marsh*, 109 S. Ct. at 1859).

those that the original analysis addressed. *See Northwoods Wilderness Recovery, Inc. v. U.S. Dep't of Agric. Forest Serv.*, 192 F. App'x 369, 376 (6th Cir. 2006).

When faced with purportedly significant new circumstances or information, agencies often determine whether further supplementation of a given plan is necessary by drafting a Supplemental Information Report. *See Northwoods Wilderness Recovery, Inc.*, 192 F. App'x at 376. SIRs are "formal instruments for documenting whether new information is sufficiently significant" to require further supplementation. *See id.* at 371 (citing *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir.2000)); *see also* Forest Service Handbook Directive 1909.15 § 18.1.[22] An SIR is not as detailed or thorough as a SEIS, and the agency need not subject it to public comment. *See Dombeck*, 222 F.3d at 560. An agency's proper compilation of an SIR can satisfy arbitrary and capricious review, even where the agency decides that no further supplementation is necessary, so long as the agency reached a rational conclusion based on the supplemental evidence presented. *See Northwoods Wilderness Recovery, Inc.*, 192 F. App'x at 376–77 (determination that supplementation was unnecessary satisfied arbitrary and capricious review because SIR addressed record evidence and plaintiff could not show that the Service "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency").

Here, the Service's silence proves problematic for APA review. The Court's standard is one of review. Indeed, in the APA context, the Court's sole task is to assess the lawfulness of the agency's action based on the reasons offered by the agency. *See State Farm Mut. Auto. Ins. Co.*, 103 S. Ct. at 2870. As to Heartwood's supplemental letters, the Service leaves the Court wondering as to the Service's perceptions of the effects and implications. The Service offered no Record-

---

[22] The Service never responded to Heartwood's citation to this Forest Service policy, one that clearly envisions potential supplementation of even an EA.

based rationale, provided no guidance on its thought process, and left Heartwood, and now the Court, guessing as to why the supplemental information did not spawn any change. It could well be that the Service gave due consideration to Heartwood's material and rationally concluded that the two sets of supplemental letters did not require further action. But on this Record, at least, it's also plausible that the materials never even made it past the front desk. The briefing AUSA, who offers a series of rationales and conclusions in advocacy, is not the Service and cannot plug the hole.

Moreover, the Service's internal guidance, whether or not legally binding, provides reason to believe that the Service should have, in the ordinary course, offered some response or analysis to Heartwood's supplemental information. The Service's NEPA Handbook provides that the Service should "be alert for new information and changed circumstances" that may require supplementation or revision to ongoing programs or projects. *See* Forest Service Handbook Directive 1909.15 § 18. And when "new information or changed circumstances" come to the attention of the responsible official after a decision has been made, the responsible official must submit the information for interdisciplinary review. *See id.* at § 18.1. If, after interdisciplinary review, the responsible official determines that no revision is necessary, implementation continues. *See id.* Regardless of the result, however, the Handbook directs the Service to "[d]ocument the results of the interdisciplinary review" as part of the project file in the form of an SIR. *See id.* The SIR should "conclude with whether or not a correction, supplement, or revision is needed, and if not, the reasons why." *Id.* The Handbook also expressly directs the Service to "[s]upplement or revise an EA if the interdisciplinary review of new information or changed circumstances indicates that changes in the EA are needed to address environmental concerns that have a bearing on the action or its impacts." *See id.* at § 18.4.

Here, the Service did not prepare an SIR after receiving Heartwood's supplemental information, or at the very least, did not include it as part of the Record. Instead, all that's presented to the Court is Claybrook's confirmation that he received the materials and would forward them for review by the appropriate team. *See* R. at 6677. The Service then stayed the charted course. That's not enough; the Service must show its work. It may well be that the interdisciplinary team carefully parsed Heartwood's materials and came to a rational conclusion that no further action was necessary. To be sure, the themes raised in the supplemental information directly echo many of the comments and objections raised by Heartwood throughout the scoping process. *See* R. at 3343–93 (objecting to Draft EA and Draft FONSI by arguing that the Service failed to consider sedimentation impacts, made various calculation errors during the project, and failed to adequately consider impacts on listed species). But the Court cannot make that leap for the Service or proceed only on an advocate's rationalization. This is especially true where the Service's own internal guidance calls for a structured form of review in these settings, culminating in a written explanation of the decision. A compliant document is not currently before the Court, all but precluding meaningful § 706(2) review, not on the original decision but rather on the later effect, if any, of the supplemental documents.

The Service argues that the information was neither "new or significant," and thus did not require a response or an alteration in its planned approach. *See* DE 60 at 39–40. That may well be the case. Again, Heartwood's comments and objections, properly resolved by the Service in the pre-decisional context, look very similar. However, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 103 S. Ct. at 2870. The problem, then, becomes that the Service did not offer up that rationale itself. Indeed, the only communication from the Service addressing the material was Claybrook's email

confirming receipt. *See* R. at 6677. The Service's brief goes on to note in its factual summary that the Service "decided that the information provided was neither new or not significant and thus did not formally respond." DE 60 at 15. But the Service did not say that for itself; its lawyers did—and for the first time in briefing this case. That rationale, unsupported by Record evidence, becomes the sort of *post hoc* rationalization that *State Farm* and cases applying it uniformly caution against. *See State Farm*, 103 S. Ct. at 2870 ("courts may not accept [] counsel's post hoc rationalizations for agency action"); *Cincinnati Bell Tel. Co. v. F.C.C.*, 69 F.3d 752, 763 (6th Cir. 1995) ("Post-hoc rationalization is not a suitable substitute for reasoned rulemaking, and support for the agency's action must exist in the rulemaking record.").

Faced only with silence, on topics imbued with expertise, the Court requires an answer. But just as the Court cannot conclude that the Service satisfied § 706(2) review as to Heartwood's supplemental materials, it also cannot conclude that the Service violated that standard. There's nothing from which to tell. In such situations, where "there was such a failure to explain administrative action as to frustrate judicial review," the proper remedy is to obtain from the Agency "such additional explanation of the reasons for the agency decision as prove necessary" to properly effectuate judicial review. *Camp v. Pitts*, 93 S. Ct. 1241, 1244 (1973). The D.C. Circuit has clarified that, in this setting, a judicial venture outside the original record should only serve as either "background information, or to determine the presence of the requisite fullness of reasons given[.]" *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285–286 (D.C. Cir. 1981) (internal quotations and citations omitted).

The Court will give the Service that opportunity, in the form of a remand, to provide additional materials necessary to facilitate § 706(2) review. The remand will not include discovery in the form of depositions or interrogatories, as federal courts have long applied a strong

presumption against scrutinizing agency decisionmakers in that way. *See Citizens to Preserve Overton Park, Inc.*, 91 S. Ct. at 825 ("Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided."); *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 541 (D.D.C. 2021) (noting the long history of the Supreme Court's "bar on probing the mental processes of agency officials") (citing *United States v. Morgan*, 61 S. Ct. 999, 1004 (1941)). Rather, the remand will allow the Service to provide its justification and rationale, in the form of an SIR or some other explanatory document, for the decision to continue the SRB Project unaltered in spite of Heartwood's two sets of post-decision supplemental materials. The Court will **DEFER** judgment on Heartwood's **post**-decisional claims under NEPA and ESA pending receipt of the Service's supplemental materials. Then, the Court will grant leave for a limited round of briefing addressing only the narrow question of whether the Service's supplemental filings satisfy § 706(2) review relative to the 2022 submissions. All other claims are resolved by this Order.

### e. Miscellaneous Claims

Heartwood's summary judgment motion complains of the "likely impossibility" of fitting everything into the Court's 40-page limit for motions. *See* DE 63 at 1–2. Thus, it invites the Court to order yet another round of briefing to address six other claims, allegedly distinct, that it contends it could not fit into a motion. *See id.* The Court declines that invitation.

Heartwood did not comply with established parameters. It uses 20 pages of its motion to detail factual and procedural background, then tenders a full 47 pages of argument as a "memo in support." *See* DE 63; 63-1. Effectively, Heartwood gave itself a 27-page enlargement. That conflicts with the briefing limit, which gave the parties one pass at a motion substantiating entitlement to judgment. *See Hazard Coal Corp. v. Am. Resources Corp.*, No. 6:20-cv-10-CHB, 2023 WL 6324327, at *3 (E.D. Ky. Sept. 27, 2023). If exceeding the page limit, applicable to all

45

parties, by over 50% is not enough, the Court wonders just how many pages Heartwood would seek to consume.

Heartwood then self-selected arguments, reserving others in hope of further briefing. *See* DE 63 at 1–2. That won't work. Since the outset of the briefing plan, the Court was clear that only one dispositive motion would be addressed. *See* DE 58 at 2 ("Each side may file only one motion for summary judgment."). The Court even agreed to extend the stock 25-page motion limit to 40 pages to accommodate the detailed and broad nature of the case Record. *See id.* But at base, this dispute is about whether an agency complied with its statutory mandates. The length of the complaint—over 400 paragraphs and 70+ pages here—does not determine a party's entitlement to briefing; the substance of the case does. And 40 pages was more than sufficient to frame the relevant questions. Heartwood, which had its own brief, a full responsive brief, and an extensive injunction brief, cannot unilaterally save arguments for a second round. The Court considers waived all arguments not raised in the already far-flung brief.

Nonetheless, many of the claims Heartwood waived by failing to raise them can be quickly disposed of. As to Heartwood's consideration of alternatives claim, the Service argued the issue, and Heartwood had a chance to respond. *See* DE 60 at 24–25. And Heartwood's contentions are plainly contradicted by Record evidence. *See, e.g.*, R. at 1942–55, 3306. Its claim concerning the Service's failure to provide an EIS is surplusage to its claim, fully briefed, challenging the Service's failure to prepare a SEIS. The Service also addressed the issue in its response, offering Heartwood a forum to reply. *See* DE 70 at 14–15. Because the briefed claim failed, that one does too. Its claim concerning "tree coring" does not appear to be a claim at all. The extent of Heartwood's discussion of the matter in the complaint is "[t]he Service collected insufficient tree cores to age stands, often just a single tree per stand." DE 22-1 at 32. The Court fails to see how

that surpasses even the pleading standard. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do"). The body of Heartwood's complaint does not allege that the Service failed to follow its own best practices concerning silviculture or herbicide application, despite asserting it as a claim in paragraph 400. *See* DE 22-1 at 72. The closest it gets is asserting that the Service dismissed consideration of alternatives, not that it failed to follow its own standards. *See id.* at 40. As already addressed, the Service dealt extensively with indirect and cumulative effects on listed bat species in its Draft and Final BAs. *See* R. at 2456–58. And the 50 C.F.R. § 402.14(a) baseline requirement Heartwood asserts in its complaint, *see* DE 22-1 at 20, is a requirement for FWS, not the Service, in crafting a BiOp.

These waived claims do not require further briefing. A dispositive ruling on Heartwood's summary judgment motion, as contemplated by the Court's scheduling order, is proper as to all pre-decisional claims.

### f. Preliminary Injunction

Finally, Heartwood moves for a preliminary injunction regarding the SRB Project. *See generally* DE 64. This does not win the day either. Of course, one of the central aspects of any preliminary injunction motion is the plaintiff showing a strong likelihood of success on the merits.[23] *See Kentucky Heartwood, Inc.*, 20 F. Supp. 2d at 1094–95 (citing *Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 101 (6th Cir. 1989)). The Sixth Circuit has repeatedly noted that a finding of no likelihood of success on the merits is "usually fatal" to a preliminary injunction motion. *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023); *O'Toole v. O'Connor*,

---

[23] Courts apply a modified preliminary injunction standard to ESA claims. The test turns almost exclusively on the merits. "[T]he Court must simply ascertain whether there has been a violation of the ESA," and if so, "the Court must grant injunctive relief." *See Kentucky Heartwood, Inc.*, 20 F. Supp. 2d at 1094 (citing *Tennessee Valley Authority v. Hill*, 98 S. Ct. 2279 (1978)). Heartwood fails that test.

802 F.3d 783, 788 (6th Cir. 2015). And that frequently resolves APA review cases for Forest
Service projects, where courts routinely deny preliminary injunctions based primarily on lack of
success likelihood. *See, e.g.*, *Watch v. Hall*, No. 23-CV-284-NEB-LIB, 2023 WL 11984984, at *5
(D. Minn. June 6, 2023); *Friends of the Clearwater v. Higgins*, 472 F. Supp. 3d 859, 874–75 (D.
Idaho 2020); *Heartwood, Inc. v. Peterson*, No. 07-cv-114-KSF, 2008 WL 2151997, at *10 (E.D.
Ky. May 21, 2008).

Here, all of Heartwood's pre-decisional claims fall short. Under APA review, the Service's
approach to its NEPA, NFMA, and ESA obligations was not arbitrary and capricious. This, as is
usually the case, proves fatal to a preliminary injunction based on these claims. True, given the
Court's remand, there is *some* potential for success on Heartwood's post-decisional
supplementation claims. But that success is not likely. As previously noted, the supplemental
materials, even if they demand some response from the Service, are of a similar vintage to the
comments and objections Scheff raised pre-decision and that the Service properly dealt with.
*Compare* R. at 2516–14 (Heartwood's response to the Service's draft EA raising issues with
sedimentation, failing to consider the NRB landslides, failure to consider listed species, and forest
age calculation) *with* R. at 5000–45 (Heartwood's February 2022 supplemental letter raising,
among other things, forest age calculation, individual stand calculation errors, failure to consider
effects on listed species, and further sedimentation or landslide issues). The Court cannot review
based on lawyer advocacy, but the Court will not ignore the full Record in forecasting likely
success on the narrow, remaining supplementation field.  To be sure, that does not mean
Heartwood's post-decisional claims will fail simply because the objections are very similar. But,
for the context of a preliminary injunction, it does mean Heartwood has failed to show that it is
likely to succeed on its post-decisional claims. The Court will not pull the emergency brake on an

agency project, now nearly 6 years into implementation and preceded by another two decades of scoping and planning, based on the mere possibility that the Service acted arbitrarily and capriciously as to supplemental materials submitted to it post-decision.

Based on the Court's grant of summary judgment in favor of the Service on Heartwood's pre-decisional claims, and Heartwood's failure to show a likelihood of success on its post-decisional claims, the Court **DENIES** Heartwood's preliminary injunction motion.

## III. Conclusion

Accordingly, the Court **ORDERS** as follows:

1. The Court **DENIES in part** DE 63, Heartwood's motion for summary judgment, for all claims except those related to the sufficiency of the Service's treatment of Heartwood's 2022 post-decisional supplemental materials;

2. The Court **GRANTS in part** DE 60, the Service's motion for summary judgment, for all claims except those related to the sufficiency of the Service's treatment of Heartwood's 2022 post-decisional supplemental materials;

3. The Court **DEFERS** decision as to the reserved issues, pending the filing of supplemental materials and briefs, pursuant to section (II)(d) of this opinion;

4. The Court **DIRECTS** the Service to file supplemental materials pursuant to section (II)(d) of this opinion **no later than May 31, 2025**.

5. The Court will then enter a separate briefing order concerning only residual claims regarding Agency review of those materials;

6. The Court **DENIES** DE 64, Heartwood's motion for preliminary injunction.

This the 28th day of March, 2025.



Signed By:

_Robert E. Wier_

**United States District Judge**