UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| KENTUCKY HEARTWOOD, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:22-CV-169-REW-HAI |
| v. | ) | |
| | ) | |
| U.S. FOREST SERVICE, *et al.*, | ) | OPINION & ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

After determining that it lacked sufficient record information to properly adjudicate Heartwood's post-decisional NEPA and ESA claims, the Court deferred ruling on summary judgment as to those claims and remanded the matter to the United States Forest Service for the limited purpose of "provid[ing] additional materials necessary to facilitate § 706(2) review." *See* DE 81 at 44–45. The Service complied with that directive, tendering a 10-page "Supplemental Information Report" addressing, among other things, the process for considering and effect of Heartwood's two post-decisional letters and supplemental information packets. *See* DE 82-1. The Court then ordered the parties to file simultaneous briefs addressing the narrow question of whether that filing "satisfies § 706(2) arbitrary and capricious review only as to Heartwood's post-decisional claims." *See* DE 83 at 2. Both parties responded, and each replied. *See* DE 84; 85; 86; 87. In the Court's view, accounting for the full record and required posture, the supplemental filing satisfies arbitrary and capricious review as to Heartwood's post-decisional NEPA and ESA claims, so the Court **GRANTS** summary judgment in favor of the Service on those remaining claims. This resolves all remaining issues.

1

I.    **Background**

The Court incorporates the full factual background supporting this case, recited previously in resolving Heartwood's decisional claims. *See* DE 81 at 2–8.

Kentucky Heartwood, pursuant to the Administrative Procedure Act (APA), challenges the Forest Service's (Service) compliance with various provisions of the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Endangered Species Act (ESA), as it relates to the Service's planning and implementation of the South Red Bird Wildlife Habitat Enhancement Project (SRB Project). *See generally* DE 1. The Service created the SRB Project—generally, a management plan for the 55,000 acres of the Daniel Boone National Forest that make up the South Red Bird Project area—to "improve wildlife habitat with a wider variety of age class distribution, plant composition, and structural diversity than currently exists" in the SRB area. R. at 1434.

Throughout the literal decades of planning and scoping that culminated in Project approval, Heartwood largely, and in most ways categorically, opposed the Service's efforts. As examples, it raised issues with the Service's planned approach in public comment meetings, *see* R. at 1220–36; it commented adversely on the Service's scoping letters, *see* R. at 1035–43; it objected to the Service's Draft and Final Environmental Assessments (EA), *see* R. at 2516–41, 2542–3298, 3346–75, and it met personally with District Ranger Robert Claybrook to voice its objections, *see* R. at 3850–51.

Along the way, the Service meaningfully and repeatedly engaged with Heartwood. To name a few ways, the Service provided individualized comment and objection responses, *see* R. at 2102–31, 3310–39, ordered supplemental reporting where Heartwood's concerns justified it,

*see* R. at 2059–94, 4996–99, and often altered the Project to accommodate Heartwood's perspectives and concerns, *see* R. at 1441–46, 2442–65.

Ultimately, the Service proceeded with the Project, as amended through the notice and comment process. On January 19, 2021, it issued its Final Decision Notice and Finding of No Significant Impact. *See* R. at 3889–3900. It simultaneously addressed Heartwood's persisting objections to the draft decisions.  *See* R. at 3847–52.

Post-decision, Heartwood tendered two sets of supplemental letters and materials again raising concerns with the SRB Project. The first came in February 2022, over a year after the final decision, when Heartwood submitted a 45-page letter, accompanied by 1,600 pages of attached information, raising a host of purported errors and oversights with the Service's project implementation. As relevant here, Heartwood's letter included an acoustic bat survey, which showed positive findings of endangered bat species the Service purportedly failed to adequately consider during Project planning, and it documented new landslides occurring in an adjacent project area that, in Heartwood's view, created environmental risks not previously considered by the Service. *See* R. at 5000–45. The second letter, tendered not just post-decision but post-lawsuit, addressed purported effects of wildfires on the scope of the SRB Area. *See* R. at 6710–23.

The Service confirmed receipt of the first supplemental letter on March 4, 2022, with Claybrook reporting that he "read the supplemental letter" and "plan[ned] on sharing [the] information with the appropriate resource specialists." *See* R. at 6677. However, the letter spawned no record-documented action on the Service's part, outside of a phone call between Heartwood and Claybrook, *see* R. at 6678; DE 82-1 at 3, and the second letter did not receive acknowledgement of receipt.  Nonetheless, the Service plainly did not cease the Project in reaction to the letters.

3

Between the two supplemental letters, Heartwood brought this APA suit against the Service, challenging the Service's alleged failure to heed certain NEPA, ESA, and NFMA requirements. *See* R. at 6682; *see generally* DE 22. Heartwood asserted a bevy of specific complaints concerning the Service's decisional compliance with those statutes. But, as pertinent here, Heartwood also challenged the Service's treatment of its post-decisional letters, asserting that the Service's decision to continue the Project unchanged violated NEPA's and ESA's directives, effective until completion, to assess the Project for significant new circumstances or information. *See* DE 63-1 at 15–19, 36–39.

After settling on a certified record, the Service moved for summary judgment on all of Heartwood's claims, arguing that the Service properly heeded its statutory obligations. *See* DE 60. Heartwood opposed the motion, filing what it titled as a "partial" motion for summary judgment in its favor. *See* DE 63.

After thorough review and consideration of the laboriously defined record, the Court held that the Service survived arbitrary and capricious review as to each of Heartwood's decisional claims. *See* DE 81 at 49. However, the Court found that the Service's lack of record-documented action, on the post-decisional matters, "prove[d] problematic for APA review." *See id.* at 41. While the Service, in briefing, proposed that the supplemental materials were neither new nor significant—and thus did not require any response—the Court rejected that justification as a post hoc rationale, offered only by the lawyers, unsupported by record evidence. *See id.* at 43–44. Instead, the Service's failure to formally respond on the record left the Court wanting for information necessary to facilitate judicial review: "[J]ust as the Court cannot conclude that the Service satisfied § 706(2) review as to Heartwood's supplemental materials, it also cannot conclude that the Service violated that standard. There's nothing from which to tell." DE 81 at 44.

4

Because the Court lacked information sufficient to render judgment, it deferred ruling on Heartwood's post-decisional claims and remanded the matter to the Service for the limited purpose of "provid[ing] additional materials necessary to facilitate § 706(2) review[,]" pursuant to the Supreme Court's holding in *Camp v. Pitts*, 93 S. Ct. 1241 (1973). *Id.* at 44–45.

The Service complied with the directive, tendering a 10-page document, entitled a "Supplemental Information Report," addressing the procedural reaction, chronology, and effect, if any, from Heartwood's post-decisional supplemental letters and accompanying materials from February and November 2022. *See* DE 82-1.

Consistent with the Court's prior plan, it then ordered the parties to brief the question whether the SIR satisfied arbitrary and capricious review as to Heartwood's post-decisional claims. *See* DE 83. Both parties responded and replied. *See* DE 84; 85; 86; 87. The matter is now ripe for review.

## II.    Standard

The standard of review remains largely unchanged from the Court's previous summary judgment ruling, with some tailoring for the post-decisional nature of the current claims.

The Court's role in APA review cases is limited to determining whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh v. Or. Natural Resources Council*, 109 S. Ct. 1851, 1861 (1989). When a party challenges agency action under the APA, "the district judge sits as an appellate tribunal," adjudicating the entire case as a "question of law, and only as a question of law." *See Chamber of Com. of United States v. Sec. & Exch. Comm'n*, 670 F. Supp. 3d 537, 550–51 (M.D. Tenn. 2023).

The arbitrary and capricious analysis takes special form when the agency's action turns on "a factual dispute which implicates substantial agency expertise." *See Marsh*, 109 S. Ct. at 1860. In that setting, the Supreme Court has explained, and the Sixth Circuit has confirmed, that where an agency decision "requires a high level of technical expertise," agencies "must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *See id.* at 1861; *Sierra Club v. Slater*, 120 F.3d 623, 633 (6th Cir. 1997).

Heartwood's post-decisional summary judgment claims concern NEPA and ESA. NEPA tasks federal agencies with preventing damage to the environment and advancing human health and welfare. *See* 42 U.S.C. § 4321; *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 462 (6th Cir. 2014). NEPA itself does not "mandate particular results" to accomplish these ends, *Dep't of Transp. v. Pub. Citizen*, 124 S. Ct. 2204, 2209 (2004), but imposes procedural requirements to focus agencies on, and require consideration of, the environmental impact of their proposals and actions. *See id.*

Before rendering a final decision, NEPA requires federal agencies proposing agency action to prepare either an Environmental Assessment (EA) or an Environmental Impact Statement (EIS), depending on the circumstances. *See* 40 C.F.R. § 1500.3; *Id.* §§ 1501.4(a)–(b). The agency's election of which document to prepare and the sufficiency of the document's consideration of relevant factors are both subject to arbitrary and capricious review. *See Kelley v. Selin*, 42 F.3d 1501, 1518–19 (6th Cir. 1995).

Importantly here, NEPA also imposes on agencies a continuing obligation to assess ongoing projects. An agency must prepare a Supplemental Environmental Impact Statement (SEIS), supplementing a previous EIS "if a major Federal action is incomplete or ongoing, and:

[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns or [t]here are significant new circumstances or information relevant to the environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii) (2020) (version then in effect).[1] Consistent with other NEPA obligations, this additional requirement compels agencies to "take a 'hard look' at the environmental effects of their planned action, even after the proposal has received initial approval." *Marsh*, 109 S. Ct. at 1859. The decision whether to supplement an EIS is itself subject to the arbitrary and capricious standard. *See id.* at 1860; *see also Sierra Club*, 120 F.3d at 633.

The Endangered Species Act imposes similar requirements. In the main, the ESA "provides a procedural framework for Federal agencies to analyze whether any proposed action 'may affect' the listed species or critical habitat." *Heartwood, Inc. v. Agpaoa*, 611 F. Supp. 2d 675, 682 (E.D. Ky. 2009), *rev'd on other grounds* 628 F.3d 261 (6th Cir. 2010). An agency must first determine whether a proposed action "may affect" a listed species. 50 C.F.R. § 402.14(a). Then, if the agency determines that it may, it must consult with the Fish and Wildlife Service (FWS) to ensure that the proposed action is not likely to jeopardize the continued existence of any listed species. *Id.* § 402.14. Consultation, where necessary, can be either formal or informal depending on the circumstances, as dictated by regulation. *See id.* §§ 402.13, 402.14(a)–(b).

Here too, an agency's obligations extend beyond final decision. "If the amount or extent of taking specified in the incidental take statement is exceeded" or "[i]f new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered[,]" then the agency must reinitiate formal consultation with FWS to analyze and address the changes. 50 C.F.R. § 402.16(a)(1)–(2). An agency's decision whether to reinitiate

---

[1] This regulation has since been repealed. *See* 40 C.F.R. § 1502.9 (Apr. 11, 2025). Nonetheless, the Court applies the provision as it existed at the time Heartwood filed this suit.

formal consultation is subject to arbitrary and capricious review, though the standard is "exacting" when considering a challenge to the agency's decision not to reinitiate consultation. *See Heartwood, Inc.*, 611 F. Supp. 2d at 683.

### III.    Analysis

In its summary judgment motion, Heartwood depicts the Service's treatment of its supplemental letters and materials as arbitrary and capricious twice over. First, it argues that the Service acted arbitrarily and capriciously in failing to craft an SEIS under NEPA based on updated landslide information submitted as part of the letter. *See* DE 63-1 at 15–19. Second, it argues that the Service was required to reinitiate formal consultation with FWS based on information presented by Heartwood in its supplemental materials substantiating the presence of Gray bats, Indiana bats, and Northern Long-eared bats at "multiple locations" throughout the SRB area, *see id.* at 37–38, and because Heartwood's supplemental sedimentation concerns required the Service to reevaluate the risks to the Kentucky Arrow Darter and Snuffbox Mussel. *See id.* at 38–39. The decision not to reinitiate consultation, in Heartwood's view, was arbitrary and capricious. The first argument raises a NEPA issue; the second raises an ESA issue. The Court takes each in turn.[2]

### a.    Sedimentation

The Service's tendered SIR addresses sedimentation issues head-on. It begins by offering an overview of the long history of the Service's responses to Heartwood's sedimentation concerns. *See* DE 82-1 at 7–8. It notes that throughout scoping, notice and comment, and objection resolution, the Service responded to and altered aspects of the project to address the sedimentation

---

[2] To be sure, the SIR deals with far more than sedimentation and bat surveys. *See* DE 82-1. But Heartwood's summary judgment motion only challenged the Service's treatment of those two issues. *See* DE 63-1 at 15–19, 42–47. As the Court previously explained, "[t]he Court considers waived all arguments not raised in the already far-flung brief." DE 81 at 46. That applies just the same to any previously unraised post-decision arguments.

issues Heartwood raised. *See id.* Specifically, the Service prepared a supplemental report addressing sedimentation as it related to landslides in the adjacent Northern Red Bird (NRB) Project Area, *see* R. at 4996–99, it altered and updated project criteria to hedge against landslide risks, *see* R. at 1589–92, 2066–67, and on several occasions, prepared individualized responses to Heartwood's sedimentation-based objections, *see* R. at 2102–30.

From this, the Service describes in its SIR that "the post-decisional letter submitted by Kentucky Heartwood provided more of the same information that had already been thoroughly considered during the decision-making process and concerns raised had already been addressed by changes to the project." *See* DE 82-1 at 8.

The Court ordered the parties to address the adequacy of this response as a § 706(2) matter. The Service responded that the SIR "more than meets the standard" because "Kentucky Heartwood's concerns about landslides and soil erosion have been litigated heavily in this case, and the SIR explains that the February 22, 2022 post-decisional letter . . . provided more of the same information that had already been thoroughly considered [and addressed] during the decision making process." *See* DE 84 at 3 (internal quotations omitted). Heartwood did not respond on the merits of § 706(2) as it relates to the SIR's treatment of Heartwood's sedimentation concerns. *See* DE 85.

The Court is satisfied that the Service did not act arbitrarily and capriciously in choosing not to prepare an SEIS or otherwise alter the project based on Heartwood's post-decisional sedimentation concerns. The record supports the Service's rationale that it previously addressed the exact concerns raised by the letter during the decision-making process.

That the Service, throughout the entirety of Project planning, meaningfully distinguished between the SRB Area and NRB Area regarding landslides compels this result. Heartwood, since

9

the Project's inception, has averred that landslides in the NRB Project Area—an adjacent but entirely distinct portion of the DBNF—called into question the Service's treatment of sedimentation risks in the newly planned SRB Area. *See, e.g.*, R. at 2523–27 (Heartwood objection letter raising NRB landslides as evidence of planning inadequacies). The NRB Area, which featured similar timber harvesting plans and other operations through an earlier Service project, had long faced landslides and sedimentation challenges. As landslides increased in the NRB Area, Heartwood inferred during SRB planning that the Best Management Practices (BMP) that allegedly failed there would prove similarly ineffective in this Project. *See* R. at 2525–27 (Objection section entitled "Implementation of Group One Project Demonstrates Inadequacy of BMPs and Forest Plan Standards"). Importantly, all the landslides Heartwood raised during scoping, notice and comment, and now in its supplemental materials were entirely confined to the NRB Area.

The Service significantly addressed this issue as part of its scoping and planning processes. It first addressed sedimentation in a 2019 soil and water report prepared by Service scientists, which concluded that a combination of BMPs and project design criteria would effectively mitigate erosion risks in the SRB Area. *See* R. at 2009–10. And, critically, when Heartwood later raised specific concern over the NRB landslides, the Service surveyed the two areas and found appreciable differences relevant to landslide potential. *See* R. at 2064–67; *see also* DE 81 at 15–16 (summarizing report findings). Still, the survey led the Service to implement enhanced design criteria and BMPs for this Project, specifically designed to prevent the same landslides that had troubled the NRB Area. *See* R. at 2064–67; *see also* R. at 1538–40 (Final EA section addressing sedimentation measures and adding risk reduction measures targeting landslides), 1590 (Final EA

Appendix establishing design features aimed at soil and water resource preservation). The Court held that this treatment satisfied arbitrary and capricious review. *See* DE 81 at 11–19.

Thus, when Heartwood's letter raised more sedimentation challenges arising in the NRB (not SRB) Area, the issue was well known to the Service. It had already implemented approaches to avoid similar landslides, and nothing in Heartwood's letter called those approaches into further question. Indeed, the letter never indicates that a landslide occurred in the SRB Area, just that more landslides had occurred in the NRB Area—a problem well known to the Service throughout the entirety of the scoping and planning process. *See* R. at 5041 ("We found that more landslides had occurred in timber harvest units in the Group One project areas since signing of the Decision Notice, while some of the landslides we previously brought to the Forest Service's attention had grown larger and dumped more sediment and debris into streams."). The Service assessed the root cause of the NRB landslides during project planning, *see* R. at 2064–67, and it implemented enhanced protective measures to avoid a similar result in and distinguish this Project. As the SIR reports, Heartwood's letter, free of any suggestion of landslides in the SRB Area, does not interject new or significant information to alter the Service's approach.

What's more, Heartwood's sole focus on the NRB Area begs the question why the Service would need to craft an SEIS for this Project (or otherwise alter its approach) when the issue is confined to an entirely different project area. NEPA calls for SEIS preparation only when "[t]here are significant new circumstances or information relevant to the environmental concerns and *bearing on the proposed action* or its impacts." 40 C.F.R. § 1502.9(d)(1)(i) (2020) (emphasis added). What new circumstances bearing on the SRB Area, then, would the Service analyze? Heartwood's letter doesn't shed light on that issue, focusing solely on the fact that it "appears that these [landslide] issues were known by the Daniel Boone National Forest staff before approval

and implementation of the Group One project." R. at 5043. That doesn't bear on the SRB Project. Thus, it was not arbitrary and capricious for the Service to stay the course, and the explanation of the Service's process and thinking at the time satisfies the standard.

The Supreme Court's recent holding in *Seven County Infrastructure Coalition* also informs this result. There, the Court determined that the D.C. Circuit "erroneously required the [Surface Transportation] Board to address environmental effects from projects that are separate in time or place from the 88-mile railroad project at hand[.]" *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 145 S. Ct. 1497, 1515 (2025). In doing so, the Court also "clarif[ied] the fundamental principles for judicial review applicable in [NEPA] cases." *Id.* at 1511. "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decision[-]making, not to paralyze it." *Id.* at 1507. So, courts reviewing whether an agency complied with NEPA should "afford substantial deference to the agency[,]" and "should not micromanage" agency choices or "'substitute its judgment for that of the agency[.]'" *Id.* at 1512–13 (citing *Kleppe v. Sierra Club*, 96 S. Ct. 2718, 2730 n. 21 (1976)).

*Seven County* calls for the Court to credit the Service's SIR on two levels. First, the case confirms that an agency's NEPA obligations are confined to the particular project at hand and do not extend to all conceivable environmental effects. *See Seven Cnty.*, 145 S. Ct. at 1512–13. Thus, to the extent Heartwood uses environmental concerns from the NRB Area as a proxy for assessing the Service's NEPA compliance in the SRB Area, the attempt is misplaced or overstated. Second, the substantial deference standard turns the tide against NEPA's transformation "from a modest procedural requirement into a blunt and haphazard tool employed by project opponents[.]" *Id.* at 1513. Heartwood plainly strays into that category. Even after the Service meaningfully addressed its sedimentation concerns over many years and hundreds of pages of responsive documents,

Heartwood comes back to the Service for more, post-decision, with hundreds more pages of objections and echoed concerns purportedly requiring a new response and tack from the agency. But the Service has clearly done the needed work. It reasonably addressed sedimentation as a legitimate concern, developed a planned approach, responded clearly and consistently to Heartwood on the record, and tailored the Project to ensure against future jeopardy. "A course correction of sorts is appropriate to bring judicial review of NEPA back in line with the statutory text and common sense," *id.* at 1514, and Heartwood's current demands, repeating prior problems from a different area under different management principles, exemplify this conundrum.

The Service did not act arbitrarily and capriciously in declining to prepare an SEIS (after preparing only an Environmental Assessment in the first instance) as to Heartwood's supplemental sedimentation information, so the Court **DENIES** Heartwood's summary judgment motion and **GRANTS** the Service's summary judgment motion as to that issue.

### b.  Acoustic Bat Surveys

In its second ground of purported post-decision error, Heartwood argues that the Service acted arbitrarily and capriciously in refusing to reinitiate consultation with FWS based on acoustic bat survey results, submitted by Heartwood as part of its supplemental materials, demonstrating the presence of three endangered bat species in the SRB Area after project approval. *See* DE 63-1 at 36–39.

The Service also addressed this issue, describing its reaction and approach, in the SIR. *See* DE 82-1 at 6–7. It cited its Wildlife Resource Report and its Biological Assessment and Evaluation, which confirmed that "the Forest Service was aware of the presence, or at least the potential presence, of five federally listed species in the SRB Area . . . ." *See id.* at 6. That included the Gray bat, the Indiana Bat, and the Northern Long-eared bat, all of which could find the SRB

Area to be "suitable habitat" *See id.* at 7. FWS concurred with the Service's determination that although adverse effects as to the three species were possible, and in one case likely, formal consultation was unnecessary because "the SRB Project was within the limits of acreage set aside for incidental take previously set by the FWS's Biological Opinions." *See id.* at 7. Accordingly, the SIR concludes, "the information provided in 2022 by Kentucky Heartwood did not warrant reinitiation with the FWS . . . nor create 'changed circumstances' to warrant alteration of the project." *See id.*

In responding as a § 706(2) matter, the Service now argues that it properly declined reinitiation because "the SIR again explains that the Forest Service had already assumed the presence of those bats in its Project analysis and consultation with the U.S. Fish and Wildlife Service." DE 84 at 1. Here too, Heartwood did not address the merits. *See* DE 85.

The record readily supports the Service's view that Heartwood's supplemental data offered nothing new to or changed in the analysis, given that the Service already baked the presumed presence of the three listed bat species into project planning. Nothing in Heartwood's materials suggested that incidental take levels would exceed previous levels, or that the Project would affect the species in a way the Service failed to consider previously; it simply speculates that maternity roosts or colonies could feature in the SRB Area. *See* R. at 5040 ("Does the Forest Service know of a maternity roost or colony in the project area? Will DB-WLF-8 be followed?"). Seeing no changed circumstances from what planning and scoping already addressed, the reinitiation declination was not arbitrary and capricious.

As the Court held in its decisional summary judgment opinion, the Service adequately considered and accounted for the presence of all three bat species in designing the Project. *See* DE 81 at 35–37. Starting with initial planning and scoping, the Service prepared a Wildlife Resource

Report that listed all three bat species' presence as "potentially occur[ing] on or adjacent to the Daniel Boone National Forest." *See* R. at 2292–94; *see also* R. at 2385 (FWS species list including all three bat species as having either active habitats or potential habitats in the SRB Area). The Service's understanding that all three bat species could, or had, found their way into the SRB Area continued throughout the process. The Service's Draft Biological Assessment (BA) addressed potential environmental effects on the Northern Long-eared bat and the Indiana bat, concluding that effects would primarily be limited to daytime when the nocturnal bats are naturally less active. *See* R. at 2358–60. And the Service predicted little disturbance to the Gray bat because the species is "strongly associated with limestone caves," which are "scarce" in the SRB Area. *See* R. at 2456 (Final BA). FWS, as the Court previously addressed in its decisional summary judgment opinion, concurred with the Service's determination concerning the adverse effects on the three species. Although adverse effects would be likely for the Indiana bat, explained the Service, it crafted the Project within incidental take limits established by FWS in a prior Biological Opinion (BiOp). *See* R. at 2387–88; *see also* DE 81 at 35–37.

Thus, when Heartwood confronted the Service with a survey purportedly demonstrating that all three listed bat species were present in the SRB Area, it simply stated the assumed as evident. Beginning as early as 2019 with the Wildlife Resource Report, the Service clearly understood that all three bat species could play a part in the SRB Area's biological makeup. That resulted in the Service implementing several protective measures to limit disruption to the bat population, including a harvesting prohibition within ¼ mile of any known hibernaculum—a provision Heartwood is clearly aware of. *See* R. at 5039 (referencing the Service's Biological Assessment and Evaluation, which established the protection). This was in addition to several other built-in protective measures designed to limit species exposure and create long term positive

15

effects for the species. *See* R. at 2456–58 (imposing timber marking protocols to ensure minimal roosting site impacts, noting that cliffside proscriptions increase direct effects to bat populations, and explaining that prescribed burning could impact bats but that long term maneuverability and foraging opportunities would improve with midstory thinning).

Now, Heartwood must show either that "the amount or extent of taking specified in the incidental take statement is exceeded" or that "new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered." *See* 50 C.F.R. § 402.16(a)(1)–(2). It doesn't do either. First, nothing in Heartwood's supplemental letter claims that the Service will now exceed the specified take limits established by FWS's BiOp. *See* R. at 5039–41. And in terms of changed circumstances, it offers only a view of "presence of federally endangered gray bats at several sites" throughout the SRB Area. *See* R. at 5040–41. There's nothing novel about that. Heartwood does not suggest that there are more bats than the Service once thought present or that the number exceeds what the Service presumptively planned for. *See id.* That the Service assumed conditions that may have become true, as to bat species, did not require further action.[3]  The Service properly abstained from additional consideration.

---

[3] Heartwood also argues in its summary judgment motion that the Service was required to reinitiate consultation as to the Snuffbox Mussel and the Kentucky Arrow Darter—two listed aquatic species. *See* DE 63-1 at 39–40. The substance of the argument, though, confirms that it's merely an extension of Heartwood's NEPA sedimentation claims. *See id.* ("KY Heartwood presented new and increased concerns about the Service's lack of evaluation of the risk of more frequent and larger landslides when it presented documentation of a multitude of ongoing landslides and sedimentation areas in the NRB Project . . . . This information contradicts the Service's previous observation that the BMPs were effective in the NRB Project with few exceptions."). The same denial bases thus apply: the Service adequately addressed the NRB landslides as it relates to the SRB Project, and further references to NRB sedimentation issues do not create changed circumstances as to the SRB Project. That does not compel reinitiation or make erroneous the Service's decision to forge on.

### c. Heartwood's Miscellaneous Arguments

Heartwood eschews the opportunity to address whether the Service's SIR satisfies arbitrary and capricious review as to its post-decisional claims. Rather, it skirts the substance of the Court's prior Order and argues that the Court has already implicitly determined that the Service acted arbitrarily and capriciously by way of imposing an incognizable remedy, and that as a result, the Court now lacks jurisdiction to consider the Service's tendered SIR. Neither argument persuades. *See* DE 85 at 3–15.

Heartwood first argues that the Court's limited remand implicitly held that the Service acted arbitrarily and capriciously. That's a plain mischaracterization of the record and this Court's summary judgment Order. That Order made clear that, due to the record's silence concerning the Service's thinking on and processing of Heartwood's post-decisional supplemental materials, the Court *deferred* judgment on the post-decisional issues raised in Heartwood's summary judgment motion. *See* DE 81 at 45. The Court, plainly, did not grant relief to Heartwood—it ordered the Service to tender the information needed to address the very claims Heartwood wrongly assumes the Court resolved. *See* DE 81 at 49 ("The Court DEFERS decision as to the reserved issues, pending the filing of supplemental materials and briefs, pursuant to section (II)(d) of this opinion[.]"). That wasn't a merits decision, as much as Heartwood attempts to paint it as one. To the contrary, it was a procedural mechanism used to ensure the Court was fully informed before analyzing the merits and rendering judgment. Try as it might, Heartwood may not alter the fundamental nature of the Court's Order by simply saying it's so.

Heartwood also repeatedly cites the common refrain that administrative review cases should ordinarily be confined to the administrative record before the relevant agency. That's no doubt true. However, that narrow perspective ignores the practical realities that courts recognize

when dealing with claims premised on an agency's post-decision inaction, especially regarding the issuance of an SEIS. In that setting, "[a] broader scope of review is necessary because there will generally be little, if any, record to review." *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998). This is especially true where "the issue is whether an agency's activities have triggered NEPA's procedures." *Id.*; *see also Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("In [SEIS] cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record."); *Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999), *on reh'g*, 228 F.3d 559 (5th Cir. 2000) ("[A] district court may review evidence in addition to the administrative record to determine whether an agency adequately considered the environmental impact under NEPA of a particular project."); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (explaining that extra-record consultation is appropriate when the court must determine "whether the agency has considered all relevant factors and explained its decision") (quoting *Inland Empire Pub. Lands Council v. Glickman,* 88 F.3d 697, 703–04 (9th Cir. 1996)).

Heartwood's supplemental letters combined both these concerns—a decision not to act, implicating NEPA requirements—and the supplemental information the Court required to properly decide Heartwood's claims is just what these cases contemplate.

Heartwood further argues that the Court's remand was outside the scope of *Camp*. That's not the case. *Camp*, as the Court explained in its decisional summary judgment Order, allows the Court to obtain from the Service "such additional explanation of the reasons for the agency decision as may prove necessary" for judicial review. *Camp*, 93 S. Ct. at 1244. The *Camp* Court added a "caveat" that when the record contains a "contemporaneous explanation of the agency decision[,]" the validity of the action must "stand or fall on the propriety of that finding[.]" *Id.* The

18

precise problem here, as Heartwood contended since the outset of the case, is that the current record lacked any explanation of the Service's decision from which to judge NEPA and ESA compliance. *See* DE 1 at 26 ("The District Ranger has not provided any indication that this information has been seriously considered and has taken no action."). That left the Court and record wanting for the Service's reasoning—a circumstance that *Camp* allows the Court to remedy by obtaining "such additional explanation of the agency decision" as necessary to foster effective judicial review. *See Camp*, 93 S. Ct. at 1244.

Requiring agency supplementation in APA review cases where the Court lacks sufficient information to judge the matter is also a well-recognized approach outside of *Camp*. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 91 S. Ct. 814, 826 (1971) ("[S]ince the bare record may not disclose the factors that were considered . . . it may be necessary for the District Court to require some explanation in order to determine if the [agency] acted within the scope of [its] authority and if the [agency's] action was justifiable under the applicable standard."), *abrogated by, Califano v. Sanders*, 97 S. Ct. 980 (1977); *National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2nd Cir. 1997) (permitting courts to consider additional information obtained from the agency "only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed action"); *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989) (noting that in administrative review cases, a reviewing court may, in its discretion, "ask for additional factual evidence as an aid to understanding"). Indeed, at least one court of appeals has allowed an agency to utilize extra-record evidence prepared post litigation to demonstrate that it was not required to prepare an SEIS under NEPA. *See Dombeck*, 222 F.3d at 560. Here, similarly,

the Court required extra-record evidence to assess the Service's compliance with its post-decision NEPA and ESA obligations. *Camp* and these cases readily support the move.

Heartwood also quibbles with the timing of the Service's preparation of the SIR. That's not determinative to the analysis. For one, NEPA does not expressly address post-decision supplements to an EA/FONSI, and neither do the implementing regulations. *See Sierra Club*, 120 F.3d at 632; *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 959 (7th Cir. 2003). So, there's no definitive timeline for this sort of consideration. Heartwood doesn't point the Court to any in either NEPA or ESA. Rather, the question is simply whether, applying the arbitrary and capricious review lens, the Service took a hard look at environmental effects of the planned action based on Heartwood's supplemental materials. *See Marsh*, 109 S. Ct. at 1859. The Court now holds that it sufficiently did. And whether that occurred upon Heartwood's supplemental tender or the Court's Order does not meaningfully affect the substance of the Service's compliance. *See Marsh*, 109 S. Ct. at 1859 ("[H]aving [taken a 'hard look' at the proffered evidence] and having determined based on careful scientific analysis that the new information was of exaggerated importance, the Corps acted within the dictates of NEPA in concluding that supplementation was unnecessary."). Indeed, "if extra-record evidence shows that an agency has rectified a NEPA violation after the onset of legal proceedings, that evidence is relevant to the question of whether relief should be granted." *Dombeck*, 222 F.3d at 560. So, even if the Service prepared its SIR in response to the Court's Order and that a failure to do so would've resulted in a NEPA violation, the Court must still credit the Service's work.[4] Any other result would be "pointless" insofar as the Service's supplemental

---

[4] But the Court does not read the SIR that way. Rather, the SIR explains what the Service did at the time and why. For example, Claybrook reports a contemporaneous determination, "[u]pon review of the letters and associated attachments . . . [that] the information was not new or significant [enough] to require additional analysis or . . . halt the SRB project[.]" DE 82-1, at 3. This was prior to the March 30, 2022 meeting. The SIR simply "details the interdisciplinary team's review[,]" which concluded that "[t]he

consideration already fulfils the goals of any remand the Court may have ordered on this issue. *See id.* at 561; *cf. Mineta*, 349 F.3d at 960 (noting the futility of a remand when "NEPA's letter and spirt have been complied with" through adequate consideration of post-decision environmental effects).

Heartwood finally argues that the Court lacks jurisdiction to consider the implications of the SIR. It claims that because "Kentucky Heartwood was already granted relief of its post-decisional claims by Court ordered remand for further consideration by the Service" and it "has not brought a claim against the Service for any failure identified in the Service's issuance of an SIR[,]" there is no longer a case or controversy before the Court. *See* DE 85 at 12–15.

As previously explained, Heartwood misconstrues the Court's Order in arguing that the Court ruled in its favor on any post-decisional claims. Heartwood's stumble on that step causes it to fall on this one. Indeed, the entire jurisdictional argument rests on the supposition that the Court granted Heartwood its requested relief. Heartwood recognizes as much. *See* DE 85 at 16 ("As Kentucky Heartwood has already received relief through the Court's ordered remand, the Court need only reissue its order clarifying its previous findings."). The problem, though, is that the supposition is plainly incorrect. The post-decisional claims Heartwood raised in its summary judgment motion are still live claims, which the Court deferred for the Service's explanatory SIR. That forecloses Heartwood's jurisdictional argument.

Heartwood is similarly incorrect that it would have had to file a new claim for the Court to consider the Service's SIR. The Court's previous Order explained that it would use the Service's

---

original analysis is consistent and within the scope of the Project's Decision Notice and FONSI and no other changes are necessary." *See id.* at 3, 8. Likewise, the SIR reports that "[u]pon receipt of the November 2022 letter, . . . Claybrook asked the IDT to review it for significant new information[.]" *Id.* at 9. The SIR, again, "details the interdisciplinary team's review of Kentucky Heartwood's November letter." *See id.* The SIR explains the agency's process and thinking at the time, on the key questions, and provides the framework for review.

supplemental tender to reach a decision on Heartwood's post-decisional summary judgment claims. And after the Service complied, the Court—as it said it would—granted Heartwood and the Service the opportunity to address whether the tender satisfied arbitrary and capricious review. *See* DE 83. After all, that standard governs the post-decisional NEPA and ESA claims Heartwood asked the Court to address, and it hadn't done so at that point. Rather than address the SIR's effect, Heartwood skipped over the merits, wrongly stated that the Court ruled in its favor, and now claims a lacking case or controversy. That's the product of Heartwood's decision not to engage, not an authentic jurisdictional defect. Heartwood's post-decisional summary judgment claims were still live prior to this Order, and the Service's SIR was central to determining its NEPA and ESA compliance. All Heartwood did was squander the opportunity to have the Court factor its perspective into the analysis. Selective—really, opportunistic—engagement with the case does not jeopardize jurisdiction.

## IV.    Conclusion

Accordingly, and in conjunction with the Court's DE 81 Order, the Court **ORDERS** as follows:

1. The Court **DENIES** DE 63, Heartwood's motion for summary judgment, as to all claims related to the sufficiency of the Service's treatment of Heartwood's 2022 post-decisional supplemental materials;

2. The Court **GRANTS** DE 60, the Service's motion for summary judgment, as to all claims related to the sufficiency of the Service's treatment of Heartwood's 2022 post-decisional supplemental materials;

3. With all Heartwood's claims now resolved, the Court **STRIKES** this case from the active docket; and

4. The Court will issue a separate judgment.

This the 13th day of August, 2025.

Signed By:

**_Robert E. Wier_**

**United States District Judge**